# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

| | |
|---|---|
| TURLOCK IRRIGATION DISTRICT, individually and on behalf of all those similarly situated, | |
| Plaintiff, | Civil Action No. |
| vs. | |
| MERCK & CO., INC.; MERCK SHARP & DOHME CORP.; SCHERING-PLOUGH CORP.; SCHERING CORP.; MSP SINGAPORE CO. LLC; GLENMARK PHARMACEUTICALS, LTD.; GLENMARK GENERICS INC., U.S.A.; and PAR PHARMACEUTICAL, INC., | |
| Defendants. | |

## CLASS ACTION COMPLAINT & JURY TRIAL DEMAND

**TABLE OF CONTENTS**

**PAGE**

I.     INTRODUCTION ..................................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................4

III.   PARTIES .............................................................................................................5

IV.   CONTINUING VIOLATIONS ............................................................................8

V.    CLASS ACTION ALLEGATIONS .....................................................................8

VI.   REGULATORY FRAMEWORK ........................................................................13

      A.    The regulatory structure for approval and substitution of generic drugs..............13

            1.    The Hatch-Waxman Amendments............................................................14

            2.    Regulatory exclusivities for new drugs.....................................................16

            3.    ANDA paragraph IV certifications.............................................................17

            4.    The first filer's 180-day exclusivity period. ..............................................18

            5.    Pharmaceutical patents are frequently held to be invalid or
                  unenforceable.........................................................................................19

      B.    The competitive effects of AB-rated generic competition....................................20

            1.    The first AB-rated generic is priced below the brand...............................22

            2.    Later generics drive prices down further. ..................................................22

            3.    Brand manufacturers are incentivized to sell an AG at or
                  slightly in advance of the expiry of a branded drug's patents. .................23

      C.    Pharmaceutical manufacturers game the regulatory structure to impair
           competition. ........................................................................................25

            1.    No-AG agreements enable manufacturers to share the gains
                  from conspiring.......................................................................................27

VII.  DEFENDANTS' CONSPIRACY..........................................................................30

      A.    Merck Develops Cholesterol-Reducing Compounds............................................31

B.     Merck Applies For, and Obtains, the Original Azetidinone Patents (the '365, '115, and '966 Patents). ................................................................32

      1.     Merck files two patent applications addressing hydroxyl-substituted azetidinone compounds useful as hypocholesteremic agents. ...............................................32

      2.     Merck files a third and fourth patent application addressing hydroxyl-substituted azetidinone compounds..............................33

      3.     Merck obtains its first azetidinone patent, covering processes (the '365 patent).............................................................33

      4.     Merck obtains a second azetidinone patent covering compounds, a composition, and a method of treating atherosclerosis (the '115 patent). ............................35

      5.     Merck obtains a third azetidinone patent for use in combination with statins (the '966 patent)........................................36

C.     Merck Asks the PTO to Reissue the '115 Patent With New Ezetimibe Claims. ....................................................................................36

D.     Merck obtains approval for Zetia, the RE'721 patent, and a corresponding 16-month patent term extension....................................37

      1.     2001: Merck files an NDA for Zetia.......................................37

      2.     2002: The PTO reissues the '115 patent as the RE'721 patent.................37

      3.     2002: The FDA approves Zetia..............................................38

      4.     2002: Merck seeks a 16-month patent term extension for the RE'721 patent. ....................................................38

E.     Merck Obtains its First "Sterol Non-Absorption" Patent (the '106 Patent). ....................................................................................38

F.     Glenmark Files the First ANDA for Generic Zetia. ............................40

G.     Merck Sues First Filer Glenmark; Glenmark Counterclaims. .............40

      1.     Merck sues Glenmark for infringing the RE'721 patent. .........40

      2.     Glenmark counterclaims, alleging the RE'721 patent is invalid and unenforceable. ...............................................41

H.     Glenmark Receives Tentative Approval, and Merck Receives New Regulatory Exclusivities. ....................................................46

I.      Glenmark Seeks Partial Summary Judgment on Two Discrete Legal
        Issues. ............................................................................................................46

J.      Merck Obtains the Second Sterol Absorption Patent (the '058 Patent)................47

K.      Glenmark and Par Strike a Deal and Merck and Glenmark Settle With
        a Reverse Payment. ............................................................................................47

        1.      The Court sends Glenmark's double-patenting argument to
                trial. .......................................................................................................47

        2.      Eight days before trial, Glenmark agrees to grant Par an
                exclusive license to sell and market generic ezetimebe in the
                United States. ........................................................................................48

        3.      Two days before trial, Merck and Glenmark agree to settle by
                providing a reverse payment to Glenmark in the form of an
                agreement by Merck not to bring a competing generic to
                market. ...................................................................................................48

        4.      The no-AG agreement was a payment to Glenmark from
                Merck that benefited Glenmark and Par. ...................................................51

        5.      The value of the no-AG agreement to Merck. ............................................55

        6.      The value of the no-AG promise to Glenmark and Par. ............................58

L.      After Settling With Glenmark Merck Seeks Another Reissue and Sues
        More Generics...................................................................................................60

        1.      Merck admits invalidity and seeks reissue of the RE'721
                patent......................................................................................................60

        2.      Merck sues Mylan and Teva for infringing the RE'721 patent;
                both counterclaim....................................................................................61

                a.      The *Mylan* litigation................................................................61

                b.      The *Teva* litigation. .................................................................61

        3.      The Federal Circuit functionally overturns the *Glenmark*
                "error" summary judgment decision..........................................................62

        4.      Merck obtains reissuance of RE'721 patent (RE'461). ............................62

        5.      The Mylan and Teva litigations resolve....................................................63

                a.      Schering and Teva settle. ...........................................................63

|   |   | b. | The court denies Merck's motion for summary judgment of inequitable conduct................................................63 |

|   |   | 6. | After a trial, the *Mylan* court found no inequitable conduct on inventorship (only)......................................................65 |

|   |   | 7. | Schering sues Sandoz; Sandoz counterclaims; the parties settle. .............66 |

|   | M. | In 2016 Glenmark and Par Launch a Generic Form of Zetia; Merck Does Not. ........................................................................67 |

|   | N. | 180 Days Later, Five More Generics Launch.......................................................68 |

|   | O. | The No-AG Promise Was a Large Reverse Payment. ...........................................70 |

VIII.   THE SCHEME'S EFFECTS ON COMPETITION AND HARM TO TID AND THE CLASSES ................................................................................71

IX.   MARKET POWER AND DEFINITION ........................................................................72

X.   ANTICOMPETITIVE EFFECTS..................................................................................75

XI.   ANTITRUST IMPACT AND INTERSTATE COMMERCE .........................................76

XII.   DEFENDANTS' FRAUDULENT CONCEALMENT TOLLED THE APPLICABLE STATUTES OF LIMITATIONS AND DELAYED ACCRUAL OF TID'S CAUSES OF ACTION................................................................77

XIII.   CLAIMS FOR RELIEF ................................................................................................79

COUNT ONE—VIOLATION OF 15 U.S.C. § 1  (ON BEHALF OF TID AND THE NATIONWIDE INJUNCTIVE RELIEF CLASS)...........................................79

COUNT TWO—VIOLATION OF 15 U.S.C. § 2 (ON BEHALF OF TID AND THE NATIONWIDE INJUNCTIVE RELIEF CLASS)..........................................81

COUNT THREE—VIOLATION OF STATE ANTITRUST LAWS..............................81

COUNT FOUR—VIOLATION OF STATE CONSUMER PROTECTION STATUTES (ON BEHALF OF TID AND THE DAMAGES CLASS**)**...............................................................................112

COUNT FIVE—UNJUST ENRICHMENT (ON BEHALF OF TID AND THE DAMAGES CLASS)................................................................................155

XIV.   PRAYER FOR RELIEF ...............................................................................................160

XV.   JURY DEMAND ..........................................................................................................161

Plaintiff Turlock Irrigation District ("TID"), on behalf of itself and all others similarly situated, files this civil antitrust action for injunctive relief under Section 1 and Section 2 of the Sherman Act, and under applicable state laws for damages, against Merck & Company, Inc., Merck Sharp & Dohme Corporation, Schering-Plough Corporation, Schering Corporation, and MSP Singapore Company LLC (collectively, "Merck"), Glenmark Pharmaceuticals Limited and Glenmark Generics Inc., U.S.A. (collectively, "Glenmark"), and Par Pharmaceutical, Inc. ("Par"). Based upon personal knowledge, information, belief, and investigation of counsel, the Plaintiff specifically alleges:

I.    **INTRODUCTION**

1.    This complaint stems from a scheme by Defendants Merck, Glenmark, and Par to make billions of dollars by delaying competition in the cholesterol-reducing drug ezetimibe. Merck earned handsome returns off of the branded version of this drug, Zetia, for years. Glenmark aimed to challenge Merck's monopoly and sell generic Zetia and applied to the FDA for the right to do so. Prospects for competition benefiting consumers looked bright. Merck sued for patent infringement, and Glenmark responded that the patents underlying Zetia were invalid and had been obtained through fraud. Then, on the eve of trial, with all signs pointing to a win for Glenmark, the parties settled. The resulting sweetheart deal involved an agreement that Glenmark and Par, Glenmark's U.S. distributor, would forego competing for five years, leaving Merck as the entrenched monopolist, and that when it was their turn to dominate the market, Merck would return the favor by not competing with its own "authorized generic" Zetia. All three have reaped enormous rewards from their illegal conspiracy, and at the expense of TID and those similarly situated.

2.    Zetia's story begins in the 1990s, when Merck sought to identify new compounds that could reduce cholesterol and prevent the buildup of plaques in arteries. Merck turned to a

class of drugs first developed forty years earlier: ACAT inhibitors. Merck quickly identified an initial lead compound, "SCH48461," and then focused on its metabolites and metabolite-like analogues, including "SCH58235" or "ezetimibe." Merck used conventional techniques to develop these compounds into pharmaceutical compositions. Merck obtained three patents for these discoveries (one reissued as U.S. Patent No. RE37,721 (the "RE'721 patent")). Ezetimibe became the active ingredient in the blockbuster drug Zetia.

3.      In 2006, Glenmark was the first generic manufacturer to seek FDA approval to market generic Zetia, and shortly after, in 2006, Merck sued, alleging infringement of the RE'721 patent. Glenmark argued the RE'721 patent was unenforceable due to inequitable conduct before the U.S. Patent and Trademark Office ("PTO"): Glenmark alleged that Merck intentionally and deceptively failed to tell the PTO that compounds claimed in the RE'721 patent were metabolites of compounds Merck publicly disclosed years earlier, and thus the patent was invalid under the doctrine of "inherent anticipation." Glenmark also alleged that Merck withheld references that would have, at minimum, caused the examiner to ask questions about metabolites. Glenmark also argued that—separate and apart from inequitable conduct—this inherency rendered the RE'721 patent invalid for anticipation. (Merck knew well the dangers of inherency, and later conceded the invalidity of the RE'721 patent.) Had the case resulted in a decision on the ultimate merits, Glenmark would have prevailed.

4.      Rather than proceed to trial, Merck decided to settle. The Supreme Court holds that resolving patent infringement litigation by having the plaintiff make a large and unjustified payment to the allegedly infringing defendant violates federal antitrust law (assuming the other elements are satisfied). Nevertheless, Merck paid Glenmark to stay out of the market for almost five years. Merck's payment took the form of an agreement that included, at a minimum, a

promise from Merck not to launch its own generic version of Zetia (called an "authorized generic"). A week before Glenmark publicized its settlement with Merck, while litigation was still pending, it announced having received a payment from Par for the exclusive rights to market, sell, and distribute generic Zetia in the United States. Merck's no–authorized generic ("no-AG") promise was worth an additional $800 million in sales to Glenmark and Par.

5.      As the first company to apply to market generic Zetia (*i.e.*, the "first filer"), Glenmark earned the right to keep other generic companies off the market for 180 days; this was its statutory reward. But Glenmark and Par could not keep Merck from selling a generic. Brand companies launch authorized generics, particularly during a first filer's so-called 180-day exclusivity period, in an effort to staunch the massive loss of revenue attending generic entry. The brand's authorized generic takes up to 50% of generic sales away from the first filer. So even though authorized generics selling at a lower price point than the brand, they let the brand hold on to sales that it otherwise would lose.

6.      In the absence of Merck's large and unjustified payment in the form of a no-AG promise, Par and Merck each would have launched a generic version of Zetia as early as December 6, 2011 and, in any event, well before December 12, 2016. Additional generics would have launched six months later. The presence of so many generics would have driven prices down to competitive levels.

7.      Plaintiff and the indirect purchaser Classes, as alleged below, have been injured by Merck, Glenmark, and Par's conduct. In the absence of the unlawful agreement, Class members would have been able to buy less-expensive generic Zetia instead of branded Zetia from as early as December 6, 2011 through the present. The Classes have likely paid hundreds of

millions in overcharges as a result of Merck and Glenmark's unlawful agreement with Par's knowing acquiescence and acts to further and exacerbate its effects.

## II.    JURISDICTION AND VENUE

8.     TID brings this action under Section 16 of the Clayton Act (15 U.S.C. § 26) for injunctive relief and costs of suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by TID and the members of the Classes described herein by reason of the violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2).

9.     This action is also instituted under the antitrust, consumer protection, and common laws of various states and territories for damages and equitable relief, as described below.

10.     This Court has personal jurisdiction over the Defendants because they purposefully directed their business activities toward this jurisdiction and had substantial contacts with this jurisdiction, and because Plaintiff's claims for relief arise from and relate to illegal acts committed by the Defendants within this jurisdiction. Plaintiff paid unlawful overcharges for Zetia and suffered antitrust injury within this jurisdiction.

11.     Venue is properly laid in this district under 28 U.S.C. § 1391. At all relevant times, the Defendants transacted business in this district, and a substantial portion of the activity at issue in this case occurred in this district.

12.     Defendants' conduct, as described in this complaint, was within the flow of, was intended to substantially affect the interstate commerce of the United States, including in this District, and did so.

13.     During the Class Period, Defendants manufactured, sold, and shipped Zetia and generic Zetia in a continuous and uninterrupted flow of interstate commerce, which included sales of Zetia and its AB-rated generic equivalents in this District, advertisement of Zetia and its

AB-rated generic equivalents in media in this District, monitoring prescriptions of Zetia and its

AB-rated generic equivalents by prescribers within this District, and employment of product

detailers in this District, who as Defendants' agents marketed Zetia and its AB-rated generic

equivalents to prescribers in this District. Defendants' conduct had and continues to have a

direct, substantial, and reasonably foreseeable effect on interstate commerce, including

commerce within this District.

14.     This Court has personal jurisdiction over Defendants. Defendants have transacted

business, maintained substantial contacts, or committed overt acts in furtherance of the illegal

scheme throughout the United States and including in this District. The scheme has been directed

at, and has had the intended effect of, causing injury to persons residing in, located in, or doing

business throughout the United States, including in this District.

**III.    <u>PARTIES</u>**

15.     Plaintiff TID is a consumer-owned, self-funded, not-for-profit irrigation district

organized under the laws of the State of California.  TID is headquartered at 333 East Canal

Drive, Turlock, California. TID provides health benefits, including prescription drug benefits, to

eligible employees. During the Class Period, Plaintiff purchased and/or provided reimbursement

for some or all of the purchase price of Zetia or its generic equivalents, other than for resale, at

supracompetitive prices. Given its plan members' past purchases of Zetia and generic Zetia,

Plaintiff anticipates that it will continue to purchase and/or provide reimbursement for Zetia and

generic Zetia in the future, and thus has been and will continue to be injured by Defendants'

conduct.

16.     Merck & Company, Inc. is a corporation organized and existing under the laws of

the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road,

Kenilworth, New Jersey 07033. It is or was the parent company of defendants Merck Sharp &

Dohme Corporation and MSP Singapore Company LLC. Merck & Company, Inc. is registered with the New York Department of State as a foreign corporation and maintains a registered agent in New York.

17.     Merck Sharp & Dohme Corporation is a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033. It is a subsidiary of Merck & Company, Inc. and the assignee of patents relevant to this lawsuit.

18.     Schering-Plough Corporation was a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033.

19.     Schering Corporation was a corporation organized and existing under the laws of the state of New Jersey, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, New Jersey 07033. It was a wholly owned subsidiary of Schering-Plough Corporation and the original assignee of the relevant patents.

20.     In 2009, as part of Merck & Company, Inc.'s acquisition of Schering-Plough Corporation, Merck & Company, Inc. merged into Schering-Plough Corporation. Schering-Plough Corporation subsequently changed its name to Merck & Company, Inc., and the company originally known as Merck & Company, Inc. changed its named to Merck Sharp & Dohme Corporation.

21.     MSP Singapore Company LLC ("MSP") is a company organized and existing under the laws of the state of Delaware, with its principal place of business at 2000 Galloping Hill Road, Kenilworth, NJ 07033. MSP is a subsidiary of Merck & Company, Inc. and was the exclusive licensee of the relevant patents.

22.     Merck & Company, Inc., Merck Sharp & Dohme Corporation, Schering-Plough Corporation, Schering Corporation, and MSP Singapore Company LLC are collectively referred to in this complaint as "Merck."

23.     Glenmark Pharmaceuticals Limited is a company organized and existing under the laws of India, with its corporate office at Glenmark House, B. D. Sawant Marg, Andheri (E), Mumbai 400 099, India, and its registered office at B/2 Mahalaxmi Chambers, 22, Bhulabhai Desai Road, Mumbai 400 026, India.

24.     Glenmark Generics Inc., U.S.A., formerly known as Glenmark Pharmaceuticals Inc., U.S.A., is a corporation organized and existing under the laws of the State of Delaware and having its principal place of business at 750 Corporate Drive, Mahwah, New Jersey 07430. It is a wholly owned subsidiary of Glenmark Pharmaceuticals Limited.

25.     Glenmark Pharmaceuticals Limited and Glenmark Generics Inc., U.S.A. are collectively referred to in this complaint as "Glenmark."

26.     Par Pharmaceutical Inc. ("Par") is a corporation organized and existing under the laws of the State of New York and having its principal place of business at One Ram Ridge Road, Chestnut Ridge, New York 10977. Par is a wholly owned subsidiary of Endo International plc, an Irish corporation with its principal place of business located in Dublin, Ireland. In September 2015, Endo completed an acquisition of Par Pharmaceuticals Holdings, Inc., and combined it with its existing generics subsidiary, Qualitest Pharmaceuticals, naming the segment Par Pharmaceutical, Inc.

27.     All of Merck, Glenmark, and Par's (collectively, "Defendants'") wrongful actions described in this complaint are part of, and in furtherance of, the illegal monopolization and restraint of trade alleged herein, and were authorized, ordered, and/or undertaken by Defendants'

various officers, agents, employees, or other representatives while actively engaged in the management of Defendants' affairs (or that of their predecessors-in-interest) within the course and scope of their duties and employment, and/or with the actual, apparent, and/or ostensible authority of the Defendants.

## IV.    CONTINUING VIOLATIONS

28.    This complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, TID and the members of the Damages Classes can recover for damages that they suffered during any applicable limitations period.

## V.    CLASS ACTION ALLEGATIONS

29.    TID, on behalf of itself and all other similarly situated indirect purchasers, seeks damages, measured as overcharges, trebled where available under applicable law, against Defendants based on allegations of anticompetitive conduct in the market for Zetia and its AB-rated generic equivalents.

30.    TID brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(2), seeking equitable and injunctive relief on behalf of a Class of indirect purchasers (the "Nationwide Injunctive Relief Class") defined as follows:

> All persons and entities in the United States and its territories who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for Zetia or generic Zetia, other than for resale, from December 6, 2011 through the present (the "Class Period").
>
> This class excludes: (a) Merck, Glenmark, and Par, including any predecessor or successor of Merck or Glenmark, or Par, and their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded

prescription drug plans; (c) all persons or entities who purchased Zetia or generic Zetia for purposes of resale or directly from Merck, Glenmark, and Par, including any predecessor or successor of Merck, Glenmark or Par; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Zetia or generic Zetia were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit managers; and (g) any judges or justices involved in this action and any members of their immediate families.

31.     TID also brings this action on behalf of itself and as a class action under Federal Rules of Civil Procedure 23(a) and (b)(3) seeking damages pursuant to the antitrust, unfair competition, and consumer protection laws of the states and territories listed below (the "End-Payer Damages Jurisdictions"),[1] and the common law of unjust enrichment, on behalf of the following class (the "Damages Class"):

All persons and entities in the United States and its territories who indirectly purchased, paid, and/or provided reimbursement for some or all of the purchase price for Zetia or generic Zetia, other than for resale, from December 6, 2011 through the present (the "Class Period").

This class excludes: (a) Merck, Glenmark, and Par, including any predecessor or successor of Merck or Glenmark, or Par, their officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for cities, towns, municipalities, or counties with self-funded prescription drug plans; (c) all persons or entities who purchased Zetia or generic Zetia for purposes of resale or directly from Merck, Glenmark, and Par, including any predecessor or successor of Merck or Glenmark, or Par; (d) fully insured health plans (*i.e.*, health plans that purchased insurance covering 100% of their reimbursement obligation to members); (e) any "flat co-pay" consumers whose purchases of Zetia or generic Zetia were paid in part by a third party payer and whose co-payment was the same regardless of the retail purchase price; (f) pharmacy benefit

---

[1] The "End-Payer Damages Jurisdictions" consist of all States (except Indiana and Ohio), as well as the District of Columbia, Puerto Rico, and the U.S. Virgin Islands.

managers; and (g) any judges or justices involved in this action and any members of their immediate families.

32.    The Nationwide Injunctive Relief Class and the Damages Class are referred to herein as the "Classes."

33.    While TID does not know the exact number of the members of the Classes, TID believes there are thousands of members in each Class.

34.    Common questions of law and fact exist as to all members of the Classes. This is particularly true given the nature of Defendants' scheme, which did not vary at all Class member to Class member, but applied equally to all Class members, thereby making appropriate relief with respect to the Classes as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

a.    Whether Defendants unlawfully maintained monopoly power through their overall anticompetitive generic suppression scheme;

b.    To the extent such justifications exist, whether there were less restrictive means of achieving them;

c.    Whether direct proof of Defendants' monopoly power is available and, if so, whether it is sufficient to prove Defendants' monopoly power without the need to define the relevant market;

d.    Whether Defendants' scheme, in whole or in part, has substantially affected interstate commerce;

e.    Whether Defendants' unlawful agreement, in whole or in part, caused antitrust injury through overcharges to the business or property of TID and the members of the Classes;

-10-

f.      Whether Merck and Glenmark conspired to delay generic competition for Zetia;

g.      Whether and when Par knew of Merck and Glenmark's agreement to delay generic competition for Zetia, and what conduct it engaged in to further the conspiracy;

h.      Whether, pursuant to the reverse payment agreement, Merck's promise not to compete against Glenmark's generic product constituted a payment;

i.      Whether Merck's agreement with Glenmark was necessary to yield some cognizable, non-pretextual procompetitive benefit;

j.      Whether Merck's compensation to Glenmark was large and unexplained;

k.      Whether Par received any compensation or promise from Glenmark or Merck in connection with Merck's agreement with Glenmark;

l.      Whether Par and Glenmark's licensing agreement was informed and/or revised by expectations from the reverse payment agreement between Merck and Glenmark;

m.      Whether the reverse payment harmed competition;

n.      Whether, before December 12, 2016, Merck possessed the ability to control prices and/or exclude competition for Zetia and its AB-rated generic equivalents;

o.      Whether, from December 12, 2016 through June 12, 2017, Merck and Glenmark possessed the ability to control prices and/or exclude competition for Zetia and its AB-rated generic equivalents;

p.      Whether Defendants' unlawful monopolistic conduct was a substantial contributing factor in causing some amount of delay of the entry of AB-rated generic Zetia;

q.      Determination of a reasonable estimate of the amount of delay Defendants' unlawful monopolistic conduct caused;

-11-

r.      Whether, and if so to what extent, Defendants' conduct caused antitrust injury (*i.e.*, overcharges) to TID and Class members;

s.      Whether the alleged scheme violated the Sherman Act as alleged in Counts One and Two herein;

t.      Whether the alleged conduct violated state laws, as alleged in Counts Three and Four herein;

u.      Whether Defendants unjustly enriched themselves to the detriment of TID and the members of the Classes, thereby entitling TID and the members of the Classes to disgorgement of all benefits derived by Defendants, as alleged in Count Five herein;

v.      Whether the conduct of Defendants, as alleged in this Complaint, caused injury to the business or property of TID and the members of the Classes;

w.      The effect of Defendants' alleged conduct on the prices of Zetia and generic Zetia sold in the United States during the Class Period;

x.      The appropriate injunctive and related equitable relief for the Nationwide Class; and

y.      The appropriate class-wide measure of damages for the Damages Classes.

35.     TID's claims are typical of the claims of Class members. TID and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Zetia and generic Zetia purchased indirectly from Defendants and were deprived of earlier and more robust competition from less-expensive generic Zetia products as a result of Defendants' wrongful conduct. TID's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

36.    TID will fairly and adequately protect the interests of the Classes. TID is a member of each Class, and TID's interests are coincident with, and not antagonistic to, those of the other members of the Classes. TID is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

37.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

38.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VI.    REGULATORY FRAMEWORK

### A.    The regulatory structure for approval and substitution of generic drugs.

39.    Under the Federal Food, Drug, and Cosmetic Act ("FDCA"),[2] manufacturers that create a new drug must obtain approval from the Food and Drug Administration ("FDA") to sell the product by filing a New Drug Application ("NDA").[3] Complete NDAs include specific data

---

[2] Pub. L. No. 75-717, 52 Stat. 1040 (1938) (codified as amended in 21 U.S.C. § 301 *et seq.*).
[3] 21 U.S.C. §§ 301-392.

concerning the safety and effectiveness of the drug, as well as any information on applicable patents.[4]

40.    When the FDA approves a brand manufacturer's NDA, the manufacturer may cause the FDA to list in *Approved Drug Products with Therapeutic Equivalence Evaluations* (known as the "Orange Book") certain kinds of patents that the manufacturer asserts could reasonably be enforced against a generic manufacturer that makes, uses, or sells a generic version of the brand drug before the expiration of the listed patent(s).[5] The brand manufacturer may have listed in the Orange Book within 30 days of issuance any patents issued after the FDA approved the NDA.[6]

41.    The FDA performs only a ministerial act in listing the patents identified by the brand manufacturer in the Orange Book. The FDA does not have the authority or resources to verify the manufacturer's representations for accuracy or trustworthiness and relies completely on the manufacturer's truthfulness about the validity and applicability of any Orange Book–listed patents.

### 1.    The Hatch-Waxman Amendments.

42.    In 1984, Congress modified the FDCA by enacting the Drug Price Competition and Patent Term Restoration Act, Pub. L. No. 98-417, 98 Stat. 1585 (1984), more commonly known as the Hatch-Waxman Amendments. The Hatch-Waxman Amendments were designed to speed the introduction of low-cost generic drugs to market by permitting a generic manufacturer to file an Abbreviated New Drug Application ("ANDA") with the FDA that may rely on the scientific findings of safety and effectiveness included in the brand name drug manufacturer's

---

[4] 21 U.S.C. § 355(a), (b).
[5] For example, patents covering processes for making drug products may not be listed in the Orange Book.
[6] 21 U.S.C. § 355(b)(1), (c)(2).

original NDA, requiring only a showing that the generic drug is pharmaceutically equivalent and bioequivalent (together, "therapeutically equivalent") to the brand name drug. The premise—codified by Congress and implemented by the FDA for the past thirty years—is that two drug products that contain the same active pharmaceutical ingredient, in the same dose, delivered in the same way, absorbed into the blood stream at a similar rate over a similar period of time, are expected to be equally safe and effective. The FDA assigns generics that meet these criteria relative to their brand counterparts an "AB" rating.

43.     The FDCA and Hatch-Waxman Amendments operate on the principle that bioequivalent drug products containing identical amounts of the same active ingredients, having the same route of administration and dosage form, and meeting applicable standards of strength, quality, purity, and identity are therapeutically equivalent and may be substituted for one another. Bioequivalence demonstrates that the active ingredient of the proposed generic would be present in the blood of a patient to the same extent and for the same amount of time as the brand counterpart.[7]

44.     Through the Hatch-Waxman Amendments, Congress sought to expedite the entry of less expensive generic competitors to brand drugs, thereby reducing healthcare expenses nationwide. Congress also sought to protect pharmaceutical manufacturers' incentives to create new and innovative products.

45.     The Hatch-Waxman Amendments achieved both goals, advancing substantially the rate of generic product launches and ushering in an era of historically high profit margins for brand pharmaceutical manufacturers. In 1983, before the Hatch-Waxman Amendments, only 35% of the top-selling drugs with expired patents had generic alternatives; by 1998, nearly all

---

[7] 21 U.S.C. § 355(j)(8)(B).

did. In 1984, prescription drug revenues for brands and generics totaled $21.6 billion; by 2013, total prescription drug revenues had climbed to more than $329.2 billion, with generics accounting for 86% of prescriptions.[8] Generics are dispensed about 95% of the time when a generic form is available.[9]

### 2. Regulatory exclusivities for new drugs.

46.     To promote a balance between new drug innovation and generic drug competition, the Hatch-Waxman Amendments also provided for exclusivities (or exclusive marketing rights) for new drugs. These exclusivities are granted by the FDA upon approval of a drug if statutory requirements are met. These exclusivities are listed in the Orange Book, along with any applicable patents, and can run concurrently with the listed patents.

47.     One such exclusivity, New Chemical Entity (NCE) exclusivity, applies to products containing chemical entities never previously approved by FDA either alone or in combination. If the FDA grants a product NCE exclusivity, the agency may not accept for review any ANDA for a drug containing the same active moiety (*i.e.*, the part of the drug that makes it work as it does) for five years from the date of the NDA's approval, unless the ANDA contains a certification of patent invalidity or non-infringement, in which case an application may be submitted after four years.[10]

48.     A drug product may also receive a three-year period of exclusivity if its sponsor submits a supplemental application that contains reports of new clinical investigations (other than bioavailability studies) conducted or sponsored by the sponsor that were essential to approval of the supplemental application. If this exclusivity is granted, the FDA may not approve

---

[8] *See* IMS Institute for Healthcare Informatics, *Medicine Use and Shifting Costs of Healthcare: A Review of the Use of Medicines in the United States in 2013* 30, 51 (2014).
[9] *Id*. at 51.
[10] 21 U.S.C. § 355(j)(5)(F)(ii); 21 C.F.R. § 314.108(b)(2).

an ANDA for that drug for three years from the date on which the supplemental application is approved.[11]

49.     Regulatory exclusivities are not always absolute bars to generic entry. For example, some can be overcome by carving out information in the label or for other reasons.[12]

### 3.     ANDA paragraph IV certifications.

50.     To obtain FDA approval of an ANDA, a manufacturer must certify that the generic will not infringe any patents listed in the Orange Book. Under the Hatch-Waxman Amendments, a generic manufacturer's ANDA must contain one of four certifications:

        a.      That no patent for the brand has been filed with the FDA (a "paragraph I certification");

        b.      That the patent for the brand has expired (a "paragraph II certification");

        c.      That the patent for the brand will expire on a particular date and the manufacturer does not seek to market its generic before that date (a "paragraph III certification"); or

        d.      That the patent for the brand is invalid or will not be infringed by the generic manufacturer's proposed product (a "paragraph IV certification").[13]

51.     If a generic manufacturer files a paragraph IV certification, a brand manufacturer has the ability to delay FDA approval of the ANDA simply by suing the ANDA applicant for patent infringement. If the brand manufacturer initiates a patent infringement action against the generic filer within forty-five days of receiving notification of the paragraph IV certification, the FDA will not grant final approval to the ANDA until the earlier of (i) the passage of two-and-a-

---

[11] 21 U.S.C. § 355(j)(5)(F)(iv); 21 C.F.R. § 314.108(b)(2)(5).
[12] *See, e.g.,* 21 C.F.R. §§ 314.94(a)(8)(iv), 314.127(a)(7); 21 U.S.C. § 355a(o).
[13] 21 U.S.C. § 355(j)(2)(A)(vii).

half years, or (ii) the issuance of a decision by a court that the patent is invalid or not infringed

by the generic manufacturer's ANDA.[14] Until one of those conditions is met, the FDA may grant

"tentative approval," but cannot authorize the generic manufacturer to market its product (*i.e.*,

grant final approval). The FDA may grant an ANDA tentative approval when it determines that

the ANDA is ready for final approval but for the 30-month stay.

### 4.    The first filer's 180-day exclusivity period.

52.    Generics may be classified as (i) first filer generics, (ii) later generic filers, or (iii)

authorized generics.

53.    To encourage manufacturers to seek approval of generic versions of brand drugs,

the Hatch-Waxman Amendments grant the first paragraph IV generic manufacturer ANDA filer

("first filer") a 180-day exclusivity period to market the generic version of the drug, during

which the FDA may not grant final approval to any other generic manufacturer's ANDA for the

same brand drug.[15] That is, when a first filer submits a substantially complete ANDA with the

FDA and certifies that the unexpired patents listed in the Orange Book as covering the brand are

either invalid or not infringed by the generic, the FDA cannot approve a later generic

manufacturer's ANDA until that first generic has been on the market for 180 days.[16]

54.    The 180-day window is often referred to as the first filer's six-month or 180-day

"exclusivity"; this is a bit of a misnomer, because a brand manufacturer (such as Merck) can

launch an authorized generic ("AG") at any time, manufacturing its AG in accordance with its

---

[14] 21 U.S.C. § 355(j)(5)(B)(iii). This period is commonly called a "30-month Hatch-Waxman stay" or "30-month stay." The brand/patent holder can choose to sue the generic after 45 days, including waiting until the generic has launched its product, but, in that event, the brand cannot take advantage of the 30-month stay of FDA approval, and must instead satisfy the showing required to obtain a preliminary injunction to prevent the generic's launch.
[15] 21 U.S.C. § 355(j)(5)(B)(iv), (D).
[16] Or, until its first filer exclusivity has been forfeited. A first filer can forfeit its 180-day exclusivity by, for example, failing to obtain tentative approval from the FDA for its ANDA within 30 months of filing its ANDA. There is no forfeiture here.

approved NDA for the branded product but selling at a lower price point. Brand manufacturers frequently launch AGs in response to generic entry to recoup some of the sales they would otherwise lose.

55.     The Supreme Court has recognized that "this 180-day period of exclusivity can prove valuable, possibly 'worth several hundred million dollars'" to the first filer.[17]

56.     A first filer that informs the FDA it intends to wait until all Orange Book–listed patents expire before marketing its generic does not get a 180-day exclusivity period. Congress created this 180-day period to incentivize generic manufacturers to challenge weak or invalid patents or to invent around such patents by creating non-infringing generics.

**5.     Pharmaceutical patents are frequently held to be invalid or unenforceable.**

57.     Patents are routinely invalidated or held unenforceable, either upon reexamination or *inter partes* proceedings by the PTO, by court decision, or by jury verdict. A patent holder at all times bears the burden of proving infringement.

58.     A generic can prevail in patent infringement litigation by showing that its product does not infringe the patent (or that the patent holder cannot meet its burden to prove infringement). Another is to show that the patent is invalid or unenforceable.

59.     A patent is invalid or unenforceable when the disclosed invention is obvious in light of earlier prior art.

60.     A patent is also invalid or unenforceable when an inventor, an inventor's attorney, or another person involved with the application, with intent to mislead or deceive the PTO, fails

---

[17] *FTC v. Actavis, Inc.*, 133 S. Ct. 2223, 2229 (2013) (quoting C. Scott Hemphill, *Paying for Delay: Pharmaceutical Patent Settlement as a Regulatory Design Problem*, 81 N.Y.U. L. Rev. 1553, 1579 (2006)).

to disclose material information known to that person to be material, or submits materially false information to the PTO during prosecution.

61.    A patent is also invalid or unenforceable when a later acquired patent is not patentably distinct from the invention claimed in an earlier patent (and no exception, such as the safe harbor, applies).

62.    In these circumstances, the PTO's decision to issue a patent does not substitute for a fact-specific assessment of (i) whether the applicant made intentional misrepresentations or omissions on which the PTO relied in issuing the patent, and (ii) whether a reasonable manufacturer in the patent holder's position would have a realistic likelihood of succeeding on the merits of a patent infringement suit.

63.    As a statistical matter, if the parties litigate a pharmaceutical patent infringement suit to a decision on the merits, a challenged patent is likelier to be found invalid or not infringed than upheld. An empirical study of all substantive decisions rendered in every patent case filed in 2008 and 2009 reports that when a generic challenger stays the course until a decision on the merits, the generic wins 74% of the time.[18]

    **B.    The competitive effects of AB-rated generic competition.**

64.    Generics contain the same active ingredient(s) and are determined by the FDA to be just as safe and effective as their brand counterparts. The only material difference between generics and their corresponding brand versions is their price. Because generics are essentially commodities that cannot be therapeutically differentiated, the primary basis for competition between a branded product and its generic version, or between generic versions, is price.

---

[18] John R. Allison, Mark A. Lemley & David L. Schwartz, *Understanding the Realities of Modern Patent Litigation*, 92 Tex. L. Rev. 1769, 1787 (2014) ("[P]atentees won only 164 of the 636 definitive merits rulings, or 26%," and "that number is essentially unchanged" from a decade ago.).

Typically, generics are at least 10% less expensive than their brand counterparts when there is a single generic competitor. This discount typically increases to 50% to 80% (or more) when multiple generic competitors compete in the sale for a given drug. Consequently, the launch of a generic usually results in significant cost savings for all drug purchasers.

65.    Since the passage of the Hatch-Waxman Amendments, every state has adopted drug product selection laws that either require or permit pharmacies to substitute AB-rated generic equivalents for brand prescriptions (unless the prescribing physician specifically directs that substitution is not permitted). Through substitution laws and other institutional features of pharmaceutical distribution and use, the launch of AB-rated generics results in both rapid price decline and rapid sales shift from brand to generic purchasing. Once a generic hits the market, it quickly captures sales of the corresponding brand drug, often 80% or more of the market within the first six months after entry. In a recent study, the Federal Trade Commission ("FTC") found that on average, within a year of generic entry, generics had captured 90% of corresponding brand sales and (with multiple generics on the market) prices had dropped 85%.[19]

66.    Generic competition enables all indirect purchasers of a drug to (i) purchase generic versions of the drug at substantially lower prices, and/or (ii) purchase the brand at a reduced price.

67.    Until a generic version of the brand enters the market, however, there is no bioequivalent drug to substitute for and compete with the brand, and the brand manufacturer can therefore continue to profitably charge supracompetitive prices. Brand manufacturers, such as Merck, are well aware of generics' rapid erosion of their brand sales. Brand manufacturers thus

---

[19] *See* FTC, *Pay-for-Delay: How Drug Company Pay-Offs Cost Consumers Billions* 8 (2010), https://www.ftc.gov/sites/default/files/documents/reports/pay-delay-how-drug-company-pay- offs-cost-consumers-billions-federal-trade-commission-staff-study/100112payfordelayrpt.pdf ("FTC Pay-for-Delay Study").

seek to extend their monopoly for as long as possible, sometimes resorting to any means possible—including illegal means—to delay or prevent generic competition.

### 1.    The first AB-rated generic is priced below the brand.

68.    Experience and economic research show that the first generic manufacturer to market its product prices it below the prices of its brand counterpart.[20] Because of state substitution laws, the first generic manufacturer almost always captures a large share of sales from the brand. At the same time, there is a reduction in the average price paid for the drug at issue (brand and AB- rated generic combined).

69.    During the 180-day exclusivity period, the first filer is the only ANDA-approved generic manufacturer on the market, though the brand's AG can be, and often is, on the market during the 180-day exclusivity period. Without competition from other generics, during the 180-day exclusivity period a first filer generic manufacturer generally makes about 80% of all of the profits that it will ever make on the product.

### 2.    Later generics drive prices down further.

70.    Once generic competitors enter the market, the competitive process accelerates, and multiple generic manufacturers typically compete vigorously with each other over price, driving prices down toward marginal manufacturing costs.[21]

71.    According to the FDA and the FTC, the greatest price reductions happen when the number of generic competitors goes from one to two. In that situation, there are two commodities

---

[20] FTC, *Authorized Generic Drugs: Short-Term Effects and Long-Term Impact* ii-iii, vi, 34 (2011), https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short- term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs- short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf ("FTC 2011 AG Study"); FTC Pay-for-Delay Study at 1.
[21] *See, e.g.*, Tracy Regan, *Generic Entry, Price Competition, and Market Segmentation in the Prescription Drug Market*, 26 Int'l J. Indus. Org. 930 (2008); Richard G. Frank, *The Ongoing Regulation of Generic Drugs*, 357 New Eng. J. Med. 1993 (2007); Patricia M. Danzon & Li-Wei Chao, *Does Regulation Drive Out Competition in Pharmaceutical Markets?*, 43 J.L. & Econ. 311 (2000).

that compete on price. Some typical estimates are that a single generic results in a near term retail price reduction of around 10% as compared to the brand price, but that with two generic entrants the near term retail price reduction is about 50%.

72.     In a report by the FTC issued at the request of Congress in 2011, the FTC found that generics captured 80% or more of sales in the first six months.[22] (This percentage erosion of brand sales holds regardless of the number of generic entrants.) In the end, the brand manufacturer's sales decline to a small fraction of their level before generic entry. This is so because, "[a]lthough generic drugs are chemically identical to their branded counterparts, they are typically sold at substantial discounts from the branded price. According to the Congressional Budget Office, generic drugs save consumers an estimated $8 to $10 billion a year at retail pharmacies. Even more billions are saved when hospitals use generics."[23]

73.     Generic competition enables TID and all members of the proposed Classes to: (a) purchase generic versions of a drug at substantially lower prices; and/or (b) purchase the branded drug at a reduced price.

### 3.     Brand manufacturers are incentivized to sell an AG at or slightly in advance of the expiry of a branded drug's patents.

74.     A brand manufacturer may sell an AG at any time. An AG is chemically identical to the brand but sold as a generic, typically through either the brand manufacturer's subsidiary (if it has one) or a third-party distributor. An AG is essentially the brand product in a different package, but sold at a lower price.

75.     Early in the life of the patents pertaining to a branded drug, the brand manufacturer has little incentive to sell an AG—doing so would simply cannibalize sales from

---

[22] FTC 2011 AG Study at 66-67.
[23] See *Generic Drugs: Questions and Answers*, FDA, http://www.fda.gov/drugs/resourcesfor you/consumers/questionsanswers/ucm100100.htm (last visited Jan. 11, 2018).

the more profitable brand product. But as the patent nears expiry, and the prospect of generic

competition arises, the brand manufacturer's incentive to sell an AG increases.

76.    One study notes that "pharmaceutical developers facing competition from

generics have large incentives to compete with their own or licensed 'authorized generics.'"[24]

77.    Brand manufacturers sometimes begin selling AGs before the first filer generic

enters the market so they can secure multiyear purchase contracts with direct purchasers and load

the generic pipeline at the expense of the first filer generic.

78.    Competition from an AG substantially reduces drug prices and the revenues of the

first filer generic (especially during the 180-day exclusivity period).[25] A study analyzing three

examples of AGs found that "[f]or all three products, authorized generics competed aggressively

against independent generics on price, and both the authorized and independent generics

captured substantial market share from the brand."[26]

79.    The FTC found that AGs capture a significant portion of sales, reducing the first

filer generic's revenues by about 50% on average.[27] The first filer generic makes much less

money when it faces competition from an AG because (i) the AG takes a large share of unit sales

away from the first filer; and (ii) the presence of the AG causes prices, particularly generic

prices, to decrease.

---

[24] Kevin A. Hassett & Robert J. Shapiro, *Sonecon, The Impact of Authorized Generic Pharmaceuticals on the Introduction of Other Generic Pharmaceuticals* 3 (2007), http://www. sonecon.com/docs/studies/050207_authorizedgenerics.pdf.
[25] Jeremiah Helm, "The Patent End Game: Evaluating Generic Entry into a Blockbuster Pharmaceutical Market in the Absence of FDA Incentives," 14 *Mich. Telecomm. L. Rev.* 175, 189 (2007).
[26] Ernst R. Berndt et al., *Authorized Generic Drugs, Price Competition, and Consumers' Welfare*, 26 Health Affairs 790, 796 (2007).
[27] FTC 2011 AG Study at 139.

C.    **Pharmaceutical manufacturers game the regulatory structure to impair competition.**

80.    When they do not face generic competition, brand manufacturers can usually sell the brand far above the marginal cost of production, generating profit margins in excess of 70% while making hundreds of millions of dollars in sales. The ability to make those kinds of profit margins—without losing so many sales to competitors that the higher price becomes unprofitable—is what economists call market or monopoly power. When generics enter the market, however, they quickly take 80% or more of the unit sales. And when multiple generics are in the market, the competition between the generics drives their prices to near the marginal cost of production. This competition puts an end to the brand manufacturer's market or monopoly power and delivers enormous savings to drug purchasers.

81.    A brand manufacturer in the marketplace without competition from generics gets all of the profits on all of the unit sales.

82.    When the brand manufacturer competes against only the first filer generic manufacturer, they enjoy a duopoly—both tend to sell at close to the monopoly price, and make near-monopoly profits.[28]

83.    When multiple generic manufacturers enter, the brand manufacturer loses most of the unit sales; generic manufacturers sell most of the units, but at drastically reduced prices; and competition delivers enormous savings to drug purchasers.

84.    Brand and first filer generic manufacturers have a collective interest in preventing this competition from breaking out. If they work together to prevent or delay competition, they can keep the profit margins on all of the unit sales at 70% and split the resulting excess profits

---

[28] *See generally* Tony Ellery & Neal Hansen, *Pharmaceutical Lifecycle Management: Making the Most of Each and Every Brand* 108 (2012); Benjamin G. Druss et al., Listening to Generic Prozac: Winners, Losers, and Sideliners, 23 *Health Aff.* 210, 213-4 (2004).

among themselves. They can keep for themselves the enormous savings that competition would have delivered to drug purchasers.

85.     To achieve this goal, brand and generic manufacturers sometimes—unlawfully—agree, often but not exclusively in writing, to not compete and instead split the purchaser savings between themselves. These unlawful pay-off deals are often referred to as "pay-for-delay," "exclusion payment," or "reverse payment" agreements.

86.     The brand manufacturer may choose to pay off only the first filer, even if other generic manufacturers are also lined up to challenge the patents. The first filer's agreement to delay marketing its drug also prevents other generic manufacturers from marketing their products.

87.     Later ANDA filers have more modest financial expectations because they generally anticipate no market exclusivity. By the time they enter the market, there is at least the brand and one other generic on the market (and often a second generic in the form of an AG) and, thus, the drug has already been, or is on its way to being, commoditized.

88.     In the absence of an anticompetitive agreement between the brand company and the first filer, later ANDA filers have procompetitive incentives. They are motivated to expend resources to challenge the brand manufacturer's patent(s) (knowing that the first filer generic is also fighting a patent infringement suit) and to enter the market as early as possible.

89.     When an anticompetitive agreement with the first filer is already in place, however, pursuing the litigation to conclusion becomes less attractive to later filers. The later generic manufacturers know that the first filer is not leading the charge against the brand manufacturer's patent(s) (and has sometimes stipulated to the validity or enforceability of the patents as part of an anticompetitive reverse payment agreement). The later generics have to bear

the bulk of the litigation costs themselves and, upon prevailing in the patent litigation, expect to face competition from at least the first filer generic, and typically an authorized generic as well, despite having expended time and resources litigating the infringement case. The first settlement between a brand and first filer generic (such as the Glenmark agreement at issue here) will often provide that, if a later generic filer launches its generic before the delayed date agreed to by the brand and the first filer, the first filer may launch then as well—greatly reducing the incentive the later filer would otherwise have to try to enter as soon as possible.

90.     Thus, some later generics decide to simply give in to or join the conspiracy between the brand manufacturer and the first filer generic and agree to drop their challenges to the brand manufacturer's patent(s) and stay off the market until after entry by the first filer. Sometimes the brand manufacturer increases the attractiveness of doing so by offering concessions on other products.

91.     Pay-for-delay agreements are fundamentally anticompetitive and contrary to the goals of the Hatch-Waxman statutory scheme. In particular, they extend the brand manufacturer's monopoly by blocking access to more affordable generic drugs, forcing purchasers to buy expensive brands instead.

        1.      **No-AG agreements enable manufacturers to share the gains from conspiring.**

92.     In the 1990s, the pay-offs from brand manufacturers often took the form of cash payments to the generic competitor. Since the 2000s, as a result of regulatory scrutiny, congressional investigations, and class action lawsuits, brand and generic manufacturers have entered into increasingly more elaborate agreements in an attempt to hide pay-offs.

-27-

93.    One form of pay-off, at issue here, is a no-AG promise. With a no-AG promise, the brand manufacturer agrees not to market an AG version of the brand drug for some period of time after the first generic enters.

94.    Again, the first filer's ANDA exclusivity does not prohibit the brand manufacturer from marketing its AG under the authority of its NDA. The Hatch-Waxman Amendments' 180-day marketing period is "exclusive" only as against other ANDA-based products, not as against the brand manufacturer's NDA-based AG.

95.    Absent a no-AG promise, it almost always makes economic sense for the brand manufacturer to begin marketing an AG as soon as (or sometimes weeks or months before) the first generic enters the marketplace. But competition from an AG has a drastically negative effect on the first filer generic's revenues. Competition from an AG typically cuts the first filer's revenues by more than half, as the competing generic takes a substantial volume of the unit sales and drives prices lower—eliminating the duopoly and delivering commensurate savings to drug purchasers.

96.    To prevent an AG from causing this substantial loss of revenues and profits, a first filer generic may be willing to delay its entry into the marketplace in return for the brand manufacturer's agreement to forgo competing with an AG. The additional monopoly profits that the brand manufacturer gains from the delayed onset of generic competition more than make up for the profits it forgoes by not competing with an AG. The brand manufacturer gains from the delayed onset of generic competition. The first filer gains from the absence of generic competition for the first 180 days of marketing. But drug purchasers lose.

97.    The brand and first filer's reciprocal promises not to compete harm indirect purchasers like TID thrice over. The pact delays the first filer's entry into the marketplace and

thereby extends the time during which the more expensive brand is the only product on the market. By delaying the first filer's entry, the pact also delays the time when other, later, generics enter, and may discourage their entry altogether. And the pact prevents the brand from marketing an AG during the 180-day exclusivity period, reducing price competition during that period between the first filer's generic and the brand's AG.

98.    For the first filer, the difference between selling the only generic and competing against an AG for 180 days can amount to tens or even hundreds of millions of dollars, depending on the size of the brand's sales. A no-AG pledge thus has the same economic effect as a pay-off made in cash.[29]

Courts, including in this Circuit, agree that no-AG agreements are a form of payment actionable under *FTC v. Actavis* and are anticompetitive.[30]

99.    Without a settlement, the generic could enter earlier—either when the 30 month stay expires ("at risk") or when it wins the litigation. The generic manufacturer's profits (gross margins) would be high during the 180-day exclusivity period and then fall rapidly as additional generics enter. This profit flow is somewhat uncertain because (i) if the generic launches at risk, it could (theoretically) later be found to infringe a valid patent and (ii) the brand manufacturer is expected to launch an authorized generic. With a no-AG promise, the profit flow occurs later but

---

[29] *See, e.g.,* Press Release, FTC, *Statement of Chairman Jon Leibowitz on the Release of the Commission's Interim Report on Authorized Generics*, (June 24, 2009), https://www.ftc.gov/ sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authgenstatementleibowitz.pdf.
[30] *See In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224 (D. Conn. 2015); *accord, In re Loestrin 24 Fe Antitrust Litig.*, Nos. 14-2071, 15-1250, 2016 U.S. App. LEXIS 3049, at \*25-26 (1st Cir. Feb. 22, 2016); *In re Opana ER Antitrust Litig.*, No. 14 C 10150, 2016 U.S. Dist. LEXIS 16700, at \*23-25 (N.D. Ill. Feb. 10, 2016); *United Food & Commercial Workers Local 1776 & Participating Emp'rs Health & Welfare Fund v. Teikoku Pharma USA, Inc.*, 74 F. Supp. 3d 1052, 1069 (N.D. Cal. 2014); *In re Effexor XR Antitrust Litig.*, No. 11-cv-5479, 2014 U.S. Dist. LEXIS 142206, at \*62 (D.N.J. Oct. 6, 2014); *Time Ins. Co. v. Astrazeneca AB*, 52 F. Supp. 3d 705, 709-10 (E.D. Pa. 2014); *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 751 (E.D. Pa. 2014); *In re Nexium (Esomeprazole) Antitrust Litig.*, 968 F. Supp. 2d 367, 392 (D. Mass. 2013).

is surer and larger—roughly twice the size—because the generic manufacturer does not lose half of the market to the brand manufacturer's authorized generic and can charge a higher price.

100.    Pay-offs through no-AG agreements usually exceed the value that the first filer could have obtained *even if it had won* the patent infringement litigation. By settling the patent case in exchange for a no-AG payoff, the first filer converts that critical six months into a period of *total* generic exclusivity, thus doubling its unit sales and making those sales at a higher price.

## VII.   DEFENDANTS' CONSPIRACY

101.    High cholesterol is associated with coronary heart disease and atherosclerosis. Atherosclerotic coronary heart disease is a major cause of death and cardiovascular morbidity in the western world.

102.    In the 1950s, scientists developed several drugs thought to lower cholesterol levels. In 1953, scientists in France reported that phylacetic acid and its analogues—fibrates— lowered cholesterol levels.[31]

103.    In the 1970s and 80s, scientists discovered a group of cholesterol-lowering drugs known as statins. Statins lower cholesterol levels by inhibiting the enzyme that regulates the production of cholesterol in the liver, HMG-CoA reductase. In 1987, Merck launched the first statin: lovastatin. Merck later launched a second statin: simvastatin. Other drug companies— followed suit. Statins, as a class, were for many years the most profitable drugs in pharmaceutical history.

104.    The 1990s saw a renewed interest in fibrates as (1) cholesterol-lowering drugs had become big business, (2) their mechanism of action became better understood, and (3) clinical trials demonstrated their efficacy in cardiovascular events. Scientists had discovered that fibrates

---

[31] In the 1980s, scientists discovered that fibrates worked by interacting with the peroxiosome proliferator-activated receptors (PPAR-α) in the liver, muscle, and other tissues.

inhibited the enzyme Acyl-CoA cholesterol acyltransferase (ACAT), which blocked the absorption of cholesterol in the intestine (and may also inhibit cholesterol deposited within vascular walls). Clinical data showed that fibrates worked. While statins had become first line treatments, fibrates were still widely prescribed.

### A.    Merck Develops Cholesterol-Reducing Compounds

105.    In the early 1990s, Merck embarked on a broad chemical program to discover novel ACAT inhibitors. Scientists working in Schering's New Jersey facilities began developing azetidinone[32] compounds that might be useful in reducing cholesterol levels in humans.

106.    In lab experiments conducted over a couple of years, these scientists identified a lead compound, "SCH48461," and metabolites and metabolite-like analogues of that compound, including "SCH58235" or "ezetimibe." (Ezetimibe would eventually become the active ingredient in Zetia.)

107.    When Merck discovered these and other useful compounds (and their metabolites), it saw their potential to be developed into lucrative prescription drugs down the road, and sought broad patent protection.

108.    Merck knew that publishing journal articles about its research and development could potentially undermine its ability to patent its inventions. So while its discoveries occurred in the early 1990s, Merck's scientists did not publish their discoveries until after the first patent application was filed and, in some instances, only wrote about the development process over a decade later.[33]

---

[32] 2-Azetidinone is a chemical compound with the molecular formula $C_3H_5NO$. It forms the central core structure of certain antibiotics and cholesterol medications.

[33] See John W. Clader, *Ezetimibe and other Azetidinone Cholesterol Absorption Inhibitors*, 5 Current Topics Med. Chem. 243 (2005); John W. Clader, *The Discovery of Ezetimibe: A View from Outside the Receptor*, 47 J. Med. Chem. 1 (2004); Stuart B. Rosenblum et al., *Discovery of 1-(4-Fluorophenyl)-(3R)-[3-(4-fluorophenyl)-(3S)-hydroxypropyl]-(4S)-(4-hydroxyphenyl)-2- azetidinone (SCH58235): A Designed, Potent, Orally Active Inhibitor of Cholesterol Absorption*, 41 J. Med. Chem. 973 (1998); Margaret Van Heek et al., *In Vivo Metabolism-Based*

### B.    Merck Applies For, and Obtains, the Original Azetidinone Patents (the '365, '115, and '966 Patents).

109.    Beginning in 1993, Merck filed a series of related U.S. patent applications addressing hydroxyl-substituted[34] azetidinone compounds useful as hypocholesteremic (*i.e.*, cholesterol-lowering) agents.[35] Three issued as patents; one of these then reissued twice.

110.    The family of patents resulting from Merck's efforts are referred to herein as "the azetidinone patents." The azetidinone patents include U.S. Patent No. 5,631,365 ("the '365 patent"), U.S. Patent No. 5,767,115 ("the '115 patent"), the U.S. Patent No. 5,846,966 ("the '966 patent"), the RE'721 reissue patent, and the RE'461 reissue patent.

#### 1.    Merck files two patent applications addressing hydroxyl-substituted azetidinone compounds useful as hypocholesteremic agents.

111.    On September 21, 1993, Merck filed U.S. Patent Application 102,440, entitled "Hydroxy-Substituted Azetidinone Compounds Useful As Hypocholesterolemic Agents." Merck abandoned the application.

112.    On June 9, 1994, Merck filed U.S. Patent Application 257,593 as a continuation-in-part of the abandoned '440 application.

---

*Discovery of a Potent Cholesterol Absorption Inhibitor, SCH58235, in the Rat and Rhesus Monkey through the Identification of the Active Metabolites of SCH 48461,* 283 J. Pharmacology & Experimental Therapeutics 157 (1997); Sundeep Dugar et al., *Metabolism and Structure Activity Data Based Drug Design: Discovery of (-) SCH 53079, an Analog of the Potent Cholesterol Absorption Inhibitor (-) SCH 48461,* 11 Bioorganic & Med. Chem. Letters 1271 (1996); John W. Clader et al., *2-Azetidinone Cholesterol Absorption Inhibitors: Structure-Activity Relationships on the Heterocyclic Nucleus,* 39 J. Med. Chem. 3684 (1996); Brian A. McKittrick et al., *Stereoselective Synthesis and Biological Activity of Cis Azetidinones as Cholesterol Absorption Inhibitors,* 16 Bioorganic & Med. Chem. Letters 1947 (1996); Brian G. Salisbury et al., *Hypocholesterolemic Activity of a Novel Inhibitor of Cholesterol Absorption, SCH 48461,* 115 Atherosclerosis 45 (1995); Sundeep Dugar et al., *Gamma-Lactams and Related Compounds as Cholesterol Absorption Inhibitors: Homologs of the β-Lactam Cholesterol Absorption Inhibitor SCH 48461,* 24 Bioorganic & Med. Chem. Letters 2947 (1995); Stuart B. Rosenblum et al., Abstract, *Discovery of SCH 58235: A Potent Orally Active Inhibitor of Cholesterol Absorption,* Baylor College of Medicine XII International Symposium on Drugs Affecting Lipid Metabolism (Nov. 7-10, 1995); Duane A. Burnett et al., *2-Azetidinones as Inhibitors of Cholesterol Absorption,* 37 J. Med. Chem. 1733 (1994).
[34] To create SCH58235, Merck scientists used routine laboratory techniques to add fluorine to the two phenyl rings, in order to lessen the likelihood of hydroxylation (and thereby keep the compound in the body longer).
[35] All of the patent applications and communications with the PTO described herein were done by Schering Corporation and its agents, unless otherwise noted.

113.    Both the '440 application and the '593 application disclosed that the inventions described were useful as hypocholesterolemic agents in the treatment and prevention of atherosclerosis—the hardening and narrowing of the arteries due to build-up of fats and cholesterol on artery walls. These applications explained that the liver is the major organ responsible for cholesterol biosynthesis and is the prime determinant of plasma cholesterol levels. When intestinal cholesterol absorption is reduced, less cholesterol is delivered to the liver, which makes less hepatic lipoprotein and clears more plasma cholesterol (mostly LDL). As Merck put it, "the net effect of inhibiting intestinal cholesterol absorption is a decrease in plasma cholesterol levels."

114.    Merck went on to prosecute the '593 application for about three years.

2.    **Merck files a third and fourth patent application addressing hydroxyl-substituted azetidinone compounds.**

115.    On September 14, 1994, Merck filed the PCT/US94/10099 application as a continuation-in-part of the '593 application. The PCT'099 application added two example compounds in the specification, 3L and 3M, as well as *in vivo* data for 3L, 3M, and 6A-1.

116.    On March 18, 1996, the PCT'0099 application entered the national stage in the United States under 35 U.S.C. § 337 as U.S. Patent Application No. 617,751. The specification for the '751 application, as filed, was identical to the specification of the PCT'0099 application.

117.    Merck went on to prosecute the '751 application for a little over two years.

3.    **Merck obtains its first azetidinone patent, covering processes (the '365 patent).**

118.    On May 20, 1997, the '593 application—Merck's second azetidinone patent application—issued as U.S. Patent No. 5,631,365. The '365 patent was the first-issued Merck azetidinone patent.

119.    The inventors of the '365 patent are Drs. Rosenblum, Dugar, Burnett, Clader, and McKittrick. All worked for Schering in New Jersey.

120.    The '365 patent was originally assigned to Schering Corporation of Kenilworth, N.J. In 2012, Merck Sharp & Dohme became the assignee of the '365 patent by means of a conveyance from Schering Corporation.

121.    The '365 patent states that "the present invention relates to hydroxyl-substituted azetidinones useful as hypocholesterolemic agents in the treatment and prevention of atherosclerosis . . . the invention also related to a process for preparing hydroxyl-substituted azetidinones." It observes that "A few azetidinones have been reported as being useful in lowering cholesterol and/or in inhibiting the formation of cholesterol-containing lesions in mammalian arterial walls," citing U.S. Patent No. 4,983,594; Ran, *Indian J. Chem.* (1990); European Patent Publication No. 264,231; European Patent No. 199,630; and European Patent Application No. 337,549.

122.    The summary of the invention describes hypocholesterolemic compounds of formula I (Figure 6) or a pharmaceutically acceptable salt of those compounds. It also states that the invention "relates to" all of the following:

- "[A] method of lowering the serum cholesterol level in a mammal in need of such treatment comprising administering an effective amount of a compound of formula I,"

- "[A] pharmaceutical composition comprising a serum cholesterol- lowering effective amount of a compounds of formula I in a pharmaceutically acceptable carrier;"

- "[T]he use of a hydroxyl-substituted azetidinone cholesterol absorption inhibitor of formula I for combined use with a cholesterol biosynthesis inhibitors [e.g., statins] … to treat or prevent atherosclerosis or to reduce plasma cholesterol levels;" and

- "[A] process for preparing certain compounds of formula I comprising [five specific steps]."

123.    The specification notes that "Compounds of formula I can be prepared by known methods, for example those described below and in WO93/02048," and then describes several methods of preparation. It then discloses that many, if not all, of the "starting compounds" used are "either commercially available or well known in the art and can be prepared via known methods."

124.    The specification notes:

> We have found that the compounds of this invention lower serum lipid levels, in particular serum cholesterol levels. Compounds of this invention have been found to inhibit the intestinal absorption of cholesterol and to significantly reduce the formation of liver cholesteryl (sic) esters in animal models. Thus, compounds of this invention are hypocholesterolemic agents by virtue of their ability to inhibit the intestinal absorption and/or esterification of cholesterol; they are, therefore, useful in the treatment and prevention of atherosclerosis in mammals; in particular in humans.

125.    The '365 patent has four claims. All four claims claim a process of preparing a compound of formula I. Claims 1 and 3 are independent claims; Claims 2 and 4 depend on claims 1 and 3, respectively.

126.    The '365 patent expired on May 20, 2014.

**4.      Merck obtains a second azetidinone patent covering compounds, a composition, and a method of treating atherosclerosis (the '115 patent).**

127.    On June 16, 1998, the '751 application issued as U.S. Patent No. 5,767,115. The '115 patent had nine claims. Claims 1-7 claim compounds, claim 8 claims a pharmaceutical composition for the treatment or prevention of atherosclerosis (or for the reduction of plasma cholesterol levels), and claim 9 covers a method of treating or preventing atherosclerosis (or reducing plasma cholesterol levels) comprising administering to a mammal in need of such treatment an effective amount of a compound of claim 1.

128.    Ezetimibe (the active ingredient in Zetia) is within the scope of claims 1-3, 5, and 7 of the '115 patent. Ezetimibe is designated "6A" and is described in Example 6 at column 31, lines 1-10 of the specification and in claim 7 at column 40, lines 19-21.

129.    According to Merck, the '115 patent expired on June 16, 2015.

### 5.    Merck obtains a third azetidinone patent for use in combination with statins (the '966 patent).

130.    On December 9, 1998, the '825 application issued as U.S. Patent No. 5,846,966.

131.    All claims in the '966 patent refer to a hydroxyl-substituted azetidinone used *in combination with* an HMG CoA reductase inhibitor— i.e., a statin. Claim 1 refers to hydroxyl-substituted azetidinone compounds used in combination, claims 2-5 refer to compositions of those compounds used in combination, and claim 6 refers to methods of treating or preventing atherosclerosis or reducing plasma cholesterol levels in combination with statins. Claim 8 explicitly refers to simvastatin (the active ingredient in Merck's Zocor) and atorvastatin (Pfizer's Lipitor).

### C.    Merck Asks the PTO to Reissue the '115 Patent With New Ezetimibe Claims.

132.    In early 2000, Merck—including Schering Corporation—was preparing a New Drug Application for the drug product that came to be known as Zetia. Merck closely reviewed the existing patent portfolio. As a sophisticated manufacturer, Merck knew that the FDA would require it to identify the patents that claim the Zetia product (or a method of using it) by listing them in the Orange Book.

133.    On June 15, 2000, Merck filed Reissue Application No. 09/594,996, asking the PTO to reissue the '115 patent. Merck began by stating that the reissue application was filed "to correct an error concerning the failure to appreciate the full scope of the invention by not including claims of narrower scope directed to one of the most preferred compounds disclosed in

-36-

the specification," namely, ezetimibe. Merck proposed adding claims 10-13, claiming the ezetimibe compound (in both prose and graphic form, claims 10 and 11), a pharmaceutical composition for the treatment or prevention of atherosclerosis or the reduction of plasma cholesterol levels (claim 12), a method of treating or preventing atherosclerosis or reducing plasma cholesterol levels (claim 13), and a method of use thereof.

134.    Merck submitted a declaration in support of reissue signed by James R. Nelson, Staff Vice President and Associate General Counsel, Patents & Trademarks at Schering-Plough Corporation and Vice President at Schering Corporation. Nelson described the error as "the failure to include a specific claim to one of the most preferred compounds."

**D.    Merck obtains approval for Zetia, the RE'721 patent, and a corresponding 16-month patent term extension.**

**1.    2001: Merck files an NDA for Zetia.**

135.    On December 27, 2001, while the application for reissue was pending, Merck submitted NDA 21445 seeking FDA approval to market ezetimibe tablets in the United States under the brand name Zetia for the treatment of hypercholesterolemia.[36]

136.    The FDA's review of Zetia took about ten months. Merck later sought and obtained a patent term extension for the period of time encompassed by this regulatory review (discussed below).

**2.    2002: The PTO reissues the '115 patent as the RE'721 patent.**

137.    On May 28, 2002, the RE'966 application issued as U.S. Patent No. RE37,721 with new claims 10-13. These included the compound ezetimibe (claims 10-11), a composition

---

[36] The NDA sponsor is sometimes identified as Merck/Schering-Plough Pharmaceuticals and sometimes identified as MSP Singapore Company LLC. In correspondence, Schering Corporation is identified as the U.S. agent for MSP Singapore. During its review, the FDA corresponded with Schering's Regulatory Affairs department.

of ezetimibe (claim 12), and a method of using ezetimibe to treat or prevent atherosclerosis or reduce plasma cholesterol levels (claims 13).

### 3.    2002: The FDA approves Zetia.

138.    On October 25, 2002, the FDA approved the Zetia NDA and granted it a five-year New Chemical Entity exclusivity. Merck launched Zetia later that month. Zetia quickly became a steady source of profits for Merck, with annual U.S. sales of about $1 billion in 2010, $1.4 billion in 2014, and $2.6 billion by 2016.

139.    The originally approved labeling reflects that Zetia is manufactured for Merck/Schering-Plough Pharmaceuticals by Schering Corporation or Merck & Co., Inc.

### 4.    2002: Merck seeks a 16-month patent term extension for the RE'721 patent.

140.    Merck requested an extension of the patent term of the RE'721 patent on December 12, 2002, invoking federal law providing for such an extension based on the duration of the FDA's review of the Zetia NDA.[37] Merck asked for an additional 497 days of patent protection.

141.    Ultimately, on January 17, 2006, the RE'721 patent was extended through October 25, 2016. The PTO determined that the RE'721 patent was eligible for a patent term extension of 497 days. With the extension, grant in 2006, the RE'721 patent was set to expire on October 25, 2016.

### E.    Merck Obtains its First "Sterol Non-Absorption" Patent (the '106 Patent).

142.    After Merck filed its NDA, but before it was approved, Merck sought to extend its patent protection for Zetia. Merck filed a series of patent applications relating to compounds that inhibit sterol absorption and methods for treating specific conditions with those compounds. Two

---

[37] 35 U.S.C. § 156; 37 C.F.R. §§ 1.710-1.791.

issued as patents (the '106 patent and the '058 patent). This family of patents is referred to as "the sterol non-absorption" applications and patents.

143.    The sterol non-absorption applications did not claim priority to, or derive from, the azetidinone applications. Nor did they share any inventors.

144.    On April 18, 2006, Merck's Application No. 10/136,968 issued as U.S. Patent No. 7,030,106. The '106 patent was Merck's first sterol non-absorption patent. It has two claims. The inventor is Wing-Kee Philip Cho of Princeton, NJ. The assignee was originally Schering Corporation.

145.    According to Merck, the '106 patent originally was set to expire on January 25, 2022 but, with a pediatric extension, is now set to expire on July 25, 2022.

146.    The '106 patent specification says that "the present invention relates to therapeutic combinations of peroxisome proliferator-activated receptor (PPAR) activator(s) and sterol absorption inhibitor(s) for treating vascular conditions (including atherosclerosis)" (emphasis added).

147.    But neither of the claims in the '106 patent refers to combination use. Both claim pharmaceutical compositions of ezetimibe that were earlier disclosed in the RE'721 patent.[38] Given this and other earlier disclosures, the '106 patent is, and clearly was at the time of its issuance, invalid as obvious and/or for obviousness-type double patenting.

148.    By this time, Merck/Schering had listed in the Orange Book: 1) the RE'721 azetidinone patent; 2) the '966 combination-with-statins patent; and 3) the '106 sterol non-

---

[38] The compound represented in Formula II of claims 1 and 2 of the '106 patent is ezetimibe. The table in claims 1 and 2 describing the composition lists lactose monohydrate (a sugar); microcrystalline cellulose (a starch); povidone (a disintegrant); crosscarmellose sodium (a dissolving agent); sodium lauryl sulfate (a foaming agent); and magnesium stearate (a release agent). All are conventional excipients and additives. The RE'721 specification explicitly refers to compositions made using conventional excipients and additives and conventional techniques, including "non-toxic compatible fillers, binders, disintegrants, buffers, preservatives, anti-oxidants, lubricants, flavorings, thickeners, coloring agents, emulsifiers and the like."

absorption patent. The '365 process patent was not listed in the Orange Book, likely because process patents—unlike product or method of use patents—are not eligible for listing.

### F.    Glenmark Files the First ANDA for Generic Zetia.

149.    On October 25, 2006, generic drug manufacturer Glenmark filed ANDA 78-560, seeking FDA approval to market an AB-rated generic version of Zetia.[39]

150.    Merck's new chemical entity exclusivity expired on October 25, 2007, one year from the date Glenmark filed. Glenmark could not come to market until after that exclusivity expired.

151.    Glenmark's ANDA included a paragraph IV certification to all of the patents then listed in the Orange Book: the RE'721 azetidinone patent, the '966 combination-with-statins patent, and the '106 sterol non-absorption patent.[40]

### G.    Merck Sues First Filer Glenmark; Glenmark Counterclaims.

####     1.    Merck sues Glenmark for infringing the RE'721 patent.

152.    On February 9, 2007, Glenmark notified Merck of its ANDA filing and provided a detailed account of why the patents were invalid, unenforceable, and not infringed by Glenmark's ANDA product ("Glenmark's paragraph IV letter").

153.    On March 22, 2007, Merck[41] sued Glenmark in the District of New Jersey. Merck alleged that Glenmark's ANDA infringed the RE'721 patent.

154.    Merck did not sue Glenmark, in this suit or any other, for infringing the two other Orange Book listed patents, the '966 or the '106 patents. Merck apparently did not believe that it

---

[39] October 25, 2006 was the first day allowed by law and regulation for would-be generic makers of Zetia to file an ANDA for that product; that date was one year before expiration of the five-year NCE exclusivity.

[40] Because the '365 process patent was not listed in the Orange Book, Glenmark did not need to certify to it in its ANDA.

[41] In this litigation, Defendants Schering Corporation and MSP Singapore Company LLC referred to themselves collectively as "Schering." For consistency they are referred to here as "Merck" instead.

could realistically expect to win a lawsuit asserting that Glenmark's generic Zetia product would infringe the '966 combination-with-statins azetidinone patent or the '106 sterol non- absorption patent because those patents were inapplicable, invalid, or not infringed. Glenmark's product did not include a statin. And the unasserted '106 patent was, and is, invalid as obvious (as described above).

155.    Under the Hatch-Waxman Amendments, Merck's filing of the RE'721 lawsuit triggered an *automatic* 30-month stay, running from the date Glenmark notified Merck of its paragraph IV certification. This stay prevented the FDA from granting final approval of Glenmark's ANDA until the earlier of (i) the expiration of the thirty-month stay, or (ii) entry of a final judgment that the RE'721 patent was invalid, unenforceable, and/or not infringed.[42]

156.    Glenmark represented in a pleading early on that "[t]he amount at issue in this case is at least $1 billion, representing the anticipated sales by Glenmark of its generic product (and the corresponding loss of sales by [Merck])."

## 2.    Glenmark counterclaims, alleging the RE'721 patent is invalid and unenforceable.

157.    On May 23, 2007, Glenmark answered, listed its affirmative defenses, and counterclaimed.[43] Glenmark sought a declaratory judgment that the RE'721 patent was invalid and/or unenforceable. Glenmark asserted that the RE'721 patent was invalid for double patenting, anticipation, obviousness, a lack of enablement, and inventorship issues. Glenmark also asserted that the RE'721 patent was unenforceable due to inequitable conduct and that Merck was estopped or precluded from asserting infringement by reasons of actions taken and

---

[42] Thirty months from the date Glenmark sent its paragraph IV certification is August 9, 2009. At one point during the litigation, Merck asserted that the 30-month stay expired on October 25, 2010. Plaintiff alleges here that generics would have entered as early as December 6, 2011, so the day on which the stay expired—under either interpretation—is before alleged generic entry and therefore irrelevant to Plaintiff's claims.

[43] Glenmark filed a corrected answer on June 7, 2007. On March 10, 2008, Glenmark filed a first amended answer and counterclaim.

statements made to the PTO during prosecution of the application(s) that led to the RE'721 patent.[44] Glenmark refined these arguments as the litigation progressed.

158.    *Invalid for "inherent anticipation."* Glenmark argued that at least two compounds claimed in the RE'721 patent are metabolites of a hypercholesterolemic compound (SCH48461) disclosed in an earlier Schering patent application. Merck had disclosed two compounds claimed in the RE'721 patent in an earlier patent application: International Application No. PCT/US92/05972, filed on July 21, 1992 and published on February 4, 1993 as WO 93/02048 (the "PCT'048 publication").[45] Upon ingestion, at least one of these earlier disclosed compounds, SCH48461 (disclosed as Example 9), is metabolized to form two hydroxyl-substituted compounds that are both claimed in the RE'721 patent. These metabolites inherently anticipate the claims of the RE'721 patent.

159.    Under the doctrine of inherent anticipation, "a prior art reference may anticipate without disclosing a feature of the claimed invention if that missing characteristic is necessarily present, or inherent, in the single anticipating reference."[46]

160.    Merck and Schering aware of the doctrine of inherent anticipation at the time Merck filed suit against Glenmark. That doctrine featured prominently in a case Schering brought against Geneva Pharmaceuticals for allegedly infringing a patent for the prescription drug Claritin. There, on August 8, 2002, the district court concluded that:

> the natural, inevitable production of metabolic DCL upon human
> ingestion of loratadine, although not fully appreciated by persons
> of ordinary skill in that field until more recently…, demonstrates
> that this process is an inherent characteristic or functioning of the

---

[44] In Glenmark's first amended answer and counterclaim, filed on March 10, 2008, it added a claim asserting that the 497-day patent term extension Merck received for the RE'721 patent was invalid.

[45] The named co-inventors of PCT'048 are Duane A. Burnett, John W. Clader, Tiruvettipuram K. Thiruvengadem, Chou-Hong Tann, and Junning Lee. Burnett and Clader are named as co-inventors of the '721 patent. The publication date of the PCT'048 predates all applications to which the RE'721 claims priority.

[46] *Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003) (citing *Cont'l Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991)), *reh'g denied*, 348 F.3d 992 (2003).

use of loratadine, the subject of the '233 patent. Therefore, that
patent inherently anticipates Claims 1 and 3 of the '716 patent,
rendering them invalid.

161.     The district court observed that "this is not a new doctrine," and cited cases from

the 1980s and 90s. The district court also noted that Schering's policy arguments to the contrary

were "not persuasive" and that the Patent and Trademark Appeals Board's opinions Schering

cited in support of its arguments that inherency by anticipation did not apply were "not

consistent with the Federal Circuit law." The Federal Circuit later affirmed.

162.     *Inequitable conduct for failure to disclose inherency*. Glenmark argued that

Merck committed inequitable conduct during prosecution of the RE'721 patent by not disclosing

the inherency of these metabolites to the PTO. Merck did not do so before the RE'721 patent

issued, nor did it do so in any post-issuance communications with the PTO about the RE'721

patent.[47] When inequitable conduct is found, the entire patent becomes invalid and/or

unenforceable.

163.     Glenmark identified several publications describing the work that the Merck

scientists did to investigate compound SCH48461, its metabolites and metabolite-like analogues,

that supported its inherency argument—many authored or reviewed by Merck scientists who

were also inventors of the RE'721. Merck never disclosed these publications to the PTO during

prosecution of the RE'721 patent. Glenmark argued that these publications would have been

---

[47] The RE'721 patent issued on May 28, 2002. The district court *Schering v. Geneva* opinion issued on August 2,
2002. On August 14, 2002, Schering filed a Request for Certificate of Correction for the RE'721 patent with the
PTO, seeking to correct the priority information recited in the RE'721 patent (likely to ensure that it was treated as
an application filed under 35 U.S.C. § 371 and therefore had a later expiration date than the '365 and '966 patents).
On December 12, 2002, Schering filed a Request for Patent Term Extension with the PTO. On August 1, 2003, the
Federal Circuit affirmed the district court's inherency decision. Schering's request for patent term extension was not
resolved until August 29, 2006. Between May 28, 2002 and the conclusion of the patent term extension in 2006,
Schering never mentioned inherency or either *Schering v. Geneva* decision in any of its communications with the
PTO about the RE'721 patent.

material to the PTO when examining the RE'721 patent. That Merck withheld them, and key

information they contained, reflects deceptive intent. These publications included:

- Margaret Van Heek et al., Abstract, *Isolation and Identification of the Active Metabolite(s) of SCH48461 and Possible in Vivo Mechanism of Action for their Inhibition of Cholesterol Absorption*, Baylor College of Medicine XII International Symposium on Drugs Affecting Lipid Metabolism (Nov. 7-10, 1995) (the "Van Heek 1995 abstract");

- Harry R. Davis, Jr. et al., Abstract, *The Hypocholesterolemic Activity of the Potent Cholesterol Absorption Inhibitor SCH 58235 Alone and in Combination with HMG CoA Reductase Inhibitors*," Baylor College of Medicine XII International Symposium on Drugs Affecting Lipid Metabolism (Nov. 7-10, 1995) (the "Davis 1995 abstract");

- Stuart B. Rosenblum et al., Abstract, *Discovery of SCH 58235: A Potent Orally Active Inhibitor of Cholesterol Absorption*, Baylor College of Medicine XII International Symposium on Drugs Affecting Lipid Metabolism (Nov. 7-10, 1995) (the "Rosenblum 1995 abstract");

- John W. Clader et al., *2-Azetidinone Cholesterol Absorption Inhibitors: Structure-Activity Relationships on the Heterocyclic Nucleus*, 39 J. Med. Chem. 3684 (1996) (the "Clader 1996 publication");

- Sundeep Dugar et al., *Metabolism and Structure Activity Data Based Drug Design: Discovery of (-) SCH 53079, an Analog of the Potent Cholesterol Absorption Inhibitor (-) SCH 48461*, 11 Bioorganic & Med. Chem. Letters 1271 (1996) (the "Dugar 1996 publication");

- Margaret Van Heek et al., *In Vivo Metabolism-Based Discovery of a Potent Cholesterol Absorption Inhibitor, SCH58235, in the Rat and Rhesus Monkey through the Identification of the Active Metabolites of SCH 48461*, 283 J. Pharmacology & Experimental Therapeutics 157 (1997) (the "Van Heek 1997 publication");

- Stuart B. Rosenblum et al., *Discovery of 1-(4-Fluorophenyl)-(3R)-[3-(4-fluorophenyl)-(3S)-hydroxypropyl]-(4S)-(4-hydroxyphenyl)-2-azetidinone (SCH58235): A Designed, Potent, Orally Active Inhibitor of Cholesterol Absorption*, 41 J. Med. Chem. 973 (1998) (the "Rosenblum 1998 publication").

164.    *Inequitable conduct in prosecuting patent term extension*. Glenmark argued that

Merck further committed inequitable conduct when seeking the RE'721 patent term extension,

by not disclosing that at least some claims were invalid due to inherent anticipation. Merck

sought to extend the term of the RE'721 patent claims after *Schering v. Geneva* was decided, knowing that claims it sought to extend were invalid under the doctrine of inherent anticipation.

165.    *Invalidity for lack of enablement*. Glenmark argued that the RE'721 patent does not teach one skilled in the art how to use ezetimibe to prevent atherosclerosis without further experimentation, which renders claims invalid for lack of enablement. To be enabled, the specification of the patent must teach those skilled in the art how to make and use the full scope of the claimed invention without undue experimentation.

166.    *Failure to name inventors*. Glenmark argued that Merck failed to name all inventors, and took discovery on the issue. On May 10, 2006, the industry group Pharmaceutical Research and Manufacturers of America ("PhRMA") presented the Discoverers Award for contributions to the discovery of ezetimibe to three individuals: Harry R. Davis, Jr., Dr. Margaret Van Heek, and Kevin B. Alton. Merck had nominated all. None were listed as inventors on the RE'721 patent.

167.    *Lack of proper reissue*. Glenmark argued that reissue was improper, and thus the reissued claims were invalid, for failure to identify an error in the '115 patent of the type that may be properly corrected through reissue.

168.    *Invalidity for obviousness-type double patenting*. Glenmark argued that the subject matter claimed in the RE'721 patent was not patentably distinct from matter claimed in Merck's earlier issued (and earlier expiring) '365 patent. As a result, at least some claims of the RE'721 patent were alleged to be invalid for obviousness-type double patenting. Obviousness-type double patenting is judicially created doctrine grounded in public policy that prohibits claims in a second patent that are not patentably distinct from claims in a first patent.[48]

---

[48] *See* Manual of Patent Examining Procedure, Section 804, Definition of Double Patenting, retrieved July 12, 2017 from https://www.uspto.gov/web/offices/pac/mpep/s804.html.

**H.    Glenmark Receives Tentative Approval, and Merck Receives New Regulatory Exclusivities.**

169.    On April 24, 2009, the FDA tentatively approved Glenmark's Zetia ANDA. It did so within the 30 months allotted by statute, and so secured Glenmark's first filer 180-day exclusivity.

170.    When Glenmark received tentative approval, the 30-month stay prevented Glenmark from launching.

171.    In 2009, the FDA listed a new exclusivity in the Orange Book—for adding pediatric information to the label—which expired on June 5, 2011. The FDA also added pediatric exclusivities to all listed patents and exclusivities, which expired on December 6, 2011.

**I.    Glenmark Seeks Partial Summary Judgment on Two Discrete Legal Issues.**

172.    In separate motions for partial summary judgment in July of 2009, Glenmark raised two discrete legal issues as to which it did not believe there to be any disputed issues of facts. At that time, trial was scheduled for May of 2010.

173.    *Summary Judgment on Reissue Error*. Glenmark argued that the RE'721 patent was invalid for Merck's failure to identify an error of the type that may be properly corrected in reissue. Glenmark argued that the '115 patent was not, as issued, wholly or partly invalid, and that therefore it could not be properly reissued under 35 U.S.C. § 251.

174.    *Summary Judgment on Double-Patenting*. Glenmark argued that 12 of the 13 claims in the RE'721 patent were invalid by reason of obviousness-type double patenting, in light of Merck's earlier issued '365 patent.

175.    Neither Glenmark nor Merck moved for summary judgment on any of the other issues or arguments listed above (e.g., inherent anticipation, inequitable conduct, lack of enablement, or failure to name inventors).

J.    **Merck Obtains the Second Sterol Absorption Patent (the '058 Patent).**

176.    On November 3, 2009, while the Glenmark summary judgment motions were pending, Merck's Application No. 10/998,400[49] issued as U.S. Patent No. 7,612,058, Merck's second sterol non-absorption patent.

177.    The '058 patent is subject to a terminal disclaimer. According to Merck, it originally was set to expire on January 25, 2022, and with a pediatric extension is set to expire on July 25, 2022.

178.    The '058 patent includes 10 claims. All cover methods of treating conditions associated with high cholesterol (e.g., atherosclerosis, diabetes, obesity) comprising administering a pharmaceutical composition consisting of the same compound and routine pharmaceutical additives described in the '106 patent (Formula II, ezetimibe). The '058 patent was at the time it was issued, and at all times thereafter, invalid for the same reasons as the '106 sterol non-absorption patent. Like the '106 patent, the named inventor is Philip Wing-Kee Cho.

K.    **Glenmark and Par Strike a Deal and Merck and Glenmark Settle With a Reverse Payment.**

1.    **The Court sends Glenmark's double-patenting argument to trial.**

179.    On April 19, 2010, the district court issued opinions addressing each of Glenmark's motions for partial summary judgment. First, the court granted Glenmark's motion on invalidity, agreeing with Glenmark that reissuance of the '115 patent had been improper because Merck had failed to identify the kind of purported error that can be corrected in reissue. This functionally eviscerated claims 10-13, which claimed ezetimibe expressly and had been added in reissue. Merck moved for reconsideration of this order on April 30, 2010.

---

[49] On November 29, 2004, Schering filed Application No. 10/998,400 as a divisional of the '968 application, seeking another inhibition of sterol absorption patent. The primary examiner was again San-Ming Hui.

180.    That same day, the court denied Glenmark's second motion for partial summary judgment (obviousness double patenting), concluding that disputed issues of fact as to whether, at the time of the '365 patent, alternative processes for making the claimed azetidinone compounds existed. The court did not hold that there was no double patenting; rather, the court concluded that the issue of double patenting should be resolved by the finder-of-fact at trial, based on a full evidentiary record.

## 2.    Eight days before trial, Glenmark agrees to grant Par an exclusive license to sell and market generic ezetimebe in the United States.

181.    While Merck's lawsuit against Glenmark was pending, Par and Glenmark communicated regarding a licensing agreement for the sale, distribution, and marketing of generic Zetia.

182.    Soon after the Court granted summary judgment on Glenmark's invalidity argument, on May 3, 2010, Par announced it had reached a licensing agreement with Glenmark, under which Par would be Glenmark's exclusive seller, marketer, and distributor of generic Zetia in the United States.

183.    Par's agreement with Glenmark included an agreement to share the profits, as well as the marketing and litigation costs, relating to the sale of ezetimebe in the United States.

## 3.    Two days before trial, Merck and Glenmark agree to settle by providing a reverse payment to Glenmark in the form of an agreement by Merck not to bring a competing generic to market.

184.    Trial was scheduled to begin on May 12, 2010, less than a month after the court ruled on the summary judgment motions. At issue were Glenmark's affirmative defenses and counterclaims, including its assertion that claims 1 through 9 were unenforceable because of Merck's intentional failure to disclose to the PTO either (1) compounds claimed in the RE'721 were naturally occurring metabolites of SCH46481 (and therefore inherently anticipated by

earlier disclosures) or (2) the disqualifying prior art publications by Merck's own scientists that had been hidden from the PTO.

185.    On May 10, 2010, *two days before the scheduled start of trial*, Merck and Glenmark entered into an agreement that settled the patent infringement lawsuit but, as later events would show, also unlawfully allocated the market for ezetimibe.

186.    That same day, Par announced that "[u]nder the agreement, Par will be able to launch the product on December 12, 2016 or earlier under certain circumstances, head of the April 25, 2017 expiration of Merck's patent exclusivity for ZETIA."

187.    Merck and Glenmark agreed to entry of a consent judgment. To ensure there were no adverse rulings concerning the RE'721 patent as a result of the litigation, a condition of the settlement included that the parties seek to have the court vacate its partial summary judgment invalidating claims 10-13 for improper reissue. The parties gave the court a proposed order, along with the consent judgment vacating the partial summary judgment order on claims 10-13. That proposed order makes reference to the fact that the ruling of the Board of Patent Appeals and Interferences in *Ex parte Tanaka*, on which the Court based its ruling invalidating claims 10-13, had been docketed for appeal.

188.    Consistent with Par's announcement, the proceedings on entry of the consent judgment revealed that the parties had agreed that, subject to certain unrevealed caveats, Glenmark would not enter the market with its generic Zetia product until December 12, 2016.

189.    Although the consent judgment made reference to the settlement agreement, it was not filed in the court record. The parties did not publicly reveal any of the remaining terms of that agreement at the time of the settlement. Nor have the other terms of that agreement, including the identity of any party or third-party beneficiary, ever been made public.

190.    Later events revealed the thrust of the settlement. Upon information and belief, as a quid pro quo for Glenmark's agreement to drop its patent challenge and delay market entry for over five years, Merck promised not to launch a competing authorized generic version of Zetia during Glenmark's eventual 180-day exclusivity period (the "no-AG agreement"). A trier of fact reasonably could infer a no-AG agreement from the following facts:

191.    First, Merck previously admitted that marketing an authorized generic is often in its economic interest. For example, speaking about another blockbuster drug, Fosamax, a Merck executive acknowledged that Merck's "authorized generic strategy" will "maximize the value of the franchise" after entry by generic competitors.

192.    Second, Merck had a well-established history of launching authorized generics in the face of generic competition. Other branded drugs for which Merck or Schering has launched authorized generic versions include Blocadren, Clinoril, Cozaar, Diprolene, Lotrisone, Nasonex, Singulair (Oral Granules), Temodar, Blocadren, K-Dur 10, K-Dur 20, and Lotrimin AF.

193.    Third, Zetia was a blockbuster drug, with sales in the billions at the time that a generic eventually launched in 2016. Absent Glenmark's reciprocal agreement to delay entering the market, launching an authorized generic would have been in Merck's financial interest.

194.    Fourth, when Glenmark launched its generic through Par on December 12, 2016, it issued a press release describing its generic Zetia as "the first and only generic version" of Zetia in the United States, and Endo International plc, Par's corporate parent, issued a substantially identical press release the same day.

195.    Fifth, and perhaps most telling, when Glenmark, through Par, eventually did launch generic Zetia in late 2016, Merck did not launch an authorized generic during Glenmark's 180-day ANDA-exclusivity period. The absence of an authorized generic on the market by

Merck in late 2016 and the first half of 2017 is strong evidence that Merck had made a contractual agreement with Glenmark, with Par as a knowing, conscious participant in the ensuing conspiracy, not to launch such a product. During this time period—the first six months of generic launch—Merck stood to earn hundreds of millions of dollars from an AG launch.

196.   Sixth, Glenmark reported to its shareholders in May 2017 that it had expected before launching the product that it would take well more than 58% of the combined brand and generic Zetia sales that it had in fact achieved by then. In the absence of a no-AG pact, a reasonable pharmaceutical company would realistically expect to take only about a 40% market share during that time period (one half of the standard 80% erosion rate).

197.   Given Merck's and Glenmark's choice to conceal the terms of their unlawful agreement, and Par's complicity therein, TID and the Classes could publicly learn about that Merck was not going to launch an AG only when it had the incentive but declined to launch— late December 2016 and the first six months of 2017. Short of some disclosure of the confidential settlement agreement, TID and the Classes had no other way of knowing about Merck's decision to forego competing using an AG.

### 4.   The no-AG agreement was a payment to Glenmark from Merck that benefited Glenmark and Par.

198.   The no-AG agreement was a payment to Glenmark from Merck worth substantially more than Glenmark could have earned if it had come to market with generic Zetia in 2011. Glenmark could not have obtained a no-AG agreement even had it won the patent infringement litigation. By delaying generic entry for more than five years, and thereby obtaining the no-AG agreement from Merck, Glenmark was ensured six months of exclusive generic sales, free from competition from Merck's authorized generic or any other generic competitors.

199.    Par had paid Glenmark to be the exclusive distributor, marketer, and seller of Glenmark's generic ezetimebe, the expected revenues from which turned entirely on any agreement between Glenmark and Merck.

200.    Par knew of Merck and Glenmark's agreement, expected to benefit from the agreement, and knowingly benefited from the agreement.

201.    Merck and Glenmark, in turn, knew that reaping the no-AG agreement's full benefits required compliance with its terms by Par.

202.    For Merck, the benefits of the no-AG agreement were enormous. While it would forgo six months of profits on an authorized generic, in turn it would enjoy more than five years of monopoly profits selling much more expensive and profitable branded Zetia.

203.    At this pre-discovery stage, the value of the reverse payment agreement to Merck and Glenmark/Par can be estimated using the known economics of the pharmaceutical industry.

204.    The reverse payment agreement was entered into in May 2010. That agreement delayed Glenmark/Par's generic entry until December 2016. Absent the reverse payment, generic entry would have occurred much sooner than it did, and as early as December 6, 2011.

205.    By that time, other than the RE'721, no other impediments existed to the prompt approval and launch of generic ezetimibe.

206.    First, Glenmark's ANDA had already received FDA tentative approval. In effect, Glenmark had met all preconditions for final FDA approval other than the 30-month stay that Merck's enforcement of the RE'721 posed against Glenmark.

207.    Second, no other patents held by Merck would forestall generic entry. The '966 patent had claims only to combination products, but generic Zetia is not a combination product, and Merck never enforced the '966 patent against Glenmark. The '106 and '058 sterol non-

absorption patents were obvious in light of the RE'721 disclosures, and Merck never enforced those patents against Glenmark. The '365 patent was limited to the narrow processes set out in that patent, and Merck never enforced the '365 patent against Glenmark.

208.    Third, no other exclusivity existed after December 5, 2011.

209.    Fourth, as evidenced by announcements made by Glenmark and Par on May 3, 2010, Glenmark had a ready and willing partner for sales, marketing, and distribution.

210.    As to the RE'721 patent, without the reverse payment and with Merck, Glenmark, and Par acting as reasonable, economically rational companies, generic entry would have occurred much sooner than it did—as early as December 6, 2011—on a date to be determined by the jury at trial.

211.    Absent the reverse payment, reasonable, economically rational companies in the position of Glenmark and Merck may still have settled the litigation, but without a reverse payment, and with an earlier agreed entry date. That earlier date would reflect Glenmark's strong chances of winning at trial. Par likely would have urged Glenmark to push for early entry, because it had already paid Glenmark in connection with its licensing agreement, and anticipated beginning to earn that money back soon through distribution. As a result, an arms' length settlement between economically rational, law-abiding companies would have led to an agreed entry date occurring much sooner than it did, and as early as the expiration of any lawful exclusivity, *i.e.*, December 6, 2011. Any such settlement would have required parallel negotiations between Glenmark and Par, given their already-operative licensing agreement.

212.    Alternatively, absent the reverse payment Glenmark would have won the trial scheduled to start in May 2010. A finder of fact would have concluded that (for the reasons

described above) Merck failed to prove that Glenmark infringed a valid patent for one or more of the following reasons:

- Merck (through the inventors, agents, and others with a Rule 56 duty) committed inequitable conduct by intentionally and deceptively hiding the fact that the RE'721 claimed compounds that were naturally occurring metabolites of SCH 48461 (and therefore inherently anticipated by its earlier disclosure in PCT'048), which would render the entire RE'721 patent invalid or unenforceable);

- Regardless of whether Merck committed inequitable conduct, the claims of the RE'721 patent were invalid for inherent anticipation; and

- The RE'721 patent was invalid for obviousness-type double patenting over the '365 patent.

213. Reasonable, economically rational companies in the position of Glenmark and Par would have launched generic Zetia soon after a district court ruling in Glenmark's favor and the expiration of any other, lawful exclusivity.

214. Without the large and unjustified payment, several additional generics would have come to market after Glenmark's 180-day exclusivity ended—as early as June 6, 2011, and in any event much earlier than June 12, 2017. Merck's last regulatory exclusivity ran on December 6, 2011. By then, Glenmark would have resolved the RE'721 infringement claims by either winning at trial, or settling on competitive terms (without a payment), or launching at risk. And Merck had not accused Glenmark of infringing any other Orange Book listed patents for Zetia.

215. In the absence of the large and unjustified payment, Merck would have launched its authorized generic version of Zetia at or around the same time that Glenmark, through Par, launched its generic—as early as December 6, 2011—on a date to be determined by the jury.

### 5.    The value of the no-AG agreement to Merck.

216.    With generic entry in December 2011, Merck would have lost about 80% of its branded sales. But without generic entry, it kept all those sales—and continued to enjoy those branded sales until the end of 2016.

217.    Because Glenmark was the first ANDA filer, its agreement not to launch generic Zetia until December 2016 created a competition bottleneck wherein no other generic company could market a generic Zetia product until 180 days after Glenmark launched its generic product. In establishing a bottleneck using Glenmark—and, because it shared Glenmark's exclusivity by contract, Par—Merck maximized the potential for it to maintain its monopoly on Zetia for about five years longer than it otherwise would have.

218.    Determining the value to Merck of the no-AG promise is a matter of estimating the additional branded sales it enjoyed during that five-year delay, plus its first-six-month sales of the branded Zetia in 2017 after Glenmark entered the market in December 2016, compared to the sales it would have made (a) from the reduced sales of branded Zetia from December 2011 to June 2017, plus (b) the sales of its authorized generic during the same five-and- a-half-year period.

219.    Sales of branded Zetia in 2011 totaled $1.298 billion. Based on well documented patterns of sales and pricing related to generic entry, Merck's authorized generic and Glenmark/Par's generic, combined, would have captured about 80% of the amount of branded sales in the first six months, with each of those companies splitting the generic sales 50/50 (therefore, 40% each of the brand share). Those generics would have sold at 50% of the price of the brand. Using these assumptions, the value of the authorized generic sales by Merck in the first six months following generic entry in December 2011 would have been about $129.8 million ($1.298 billion times 0.5 [for the first six months] times 0.4 [share of the generic sales]

times 0.5 [generic price]. After the exclusivity period, with more than two generic entrants, research in the pharmaceutical industry suggests prices would have dropped to 20% of the brand price pre-entry. The sales of Merck's authorized generic from June 2012 to June 2017 after the expiration of Glenmark's exclusive period would therefore have been $389.4 million ($1.298 billion [2011 baseline total revenues] times 5 [years of competition] times 0.2 [accounting for 80% drop in price with more than two generics] times 0.9 [generic penetration rate in a mature market] divided by 3 [the number of generic Zetia products—Merck's authorized generic, Glenmark's generic, and at least one more generic entrant]). Therefore, the total sales of Merck's authorized generic Zetia from December 2011 to June 2017 would have been $519.2 million ($129.8 million for the first six months of exclusivity plus $389.4 million for the remaining five years).

220.    Even with generic entry, Merck could still expect to sell some branded product— based on research in this industry, about 20% of its previous sales volume when Glenmark was the sole generic competitor in the first six months of 2012, and 10% (or less) of its previous volume per year from June 2012 and onward. Thus the revenues of Zetia products to Merck in the event of timely generic entry in, say, late December 2011, over the five-and-a-half-year time period (*i.e.*, from December 2011 to June 2017) reasonably would have been expected to be about $778.8 million ($1.298 billion baseline times 0.5 [the first six-month period in 2012] times 0.2 [branded Zetia's market share after entry of Merck's AG and Glenmark's generic], *plus* $1.298 billion [baseline] times 0.1 [branded Zetia's market share after entry of other generics] times 5 [for five years ending June 2017]). Consequently, absent the no-AG agreement, Merck's revenues from December 2011 to June 2017, for both Zetia and the AG it would have launched,

would have been $1.30 billion ($519.2 million authorized generic's sales plus $778.8 million Zetia's sales).

221.    As a result of the no-AG agreement, however, Merck enjoyed full branded sales from December 2011 through December 2016 without competition from Glenmark/Par's generic (or any other generic). If one expected no growth in sales, then Merck would have about $6.490 billion in gross sales for Zetia over that five-year period. Publicly available information indicates that total sales for branded Zetia during this entire time period actually amounted to more than $9.1 billion.

222.    In addition, during the six months between December 2016 and June 2017, when other generic manufacturers received FDA approval, revenues from branded Zetia sales to Merck would have been on the order of $116.8 million ($1.298 billion [baseline] times 0.5 [for half year] times 0.2 [branded Zetia's market share while facing generic competition only from Glenmark/Par] times 0.9 [anticipating a 10% price reduction from the monopoly price after Glenmark/Par's entry]). Therefore, the total value of no-AG agreement to Merck from December 2011 to June 2017 was $6.61 billion ($6.49 billion plus $116.8 million).

223.    As a result of the no-AG agreement therefore, Merck enjoyed between about $5.31 billion ($6.61 billion minus $1.30 billion) to about $7.92 billion ($9.1 billion plus $116.8 million from 2017 minus $1.30 billion).

224.    This estimate of the no-AG agreement to Merck may even be conservative: Soon after the settlement, Mylan filed its Zetia ANDA and Merck again sued. Mylan's July 28, 2010 answer contended that Merck had increased the price of Zetia to encourage prescribers and their patients to switch to Vytorin, a drug that combined ezetimebe with simvastatin, the active ingredient of Zocor, a cholesterol-lowering drug that Merck developed earlier. Absent the no-AG

agreement, Merck would not have had the same incentive to continue increasing Zetia prices, because diverted sales would flow to Glenmark/Par's generic. With the no-AG agreement, however, Merck could comfortably raise prices on Zetia for the next five years, knowing it would keep some Zetia patients at higher prices and capture those who switched to Vytorin.

### 6.    The value of the no-AG promise to Glenmark and Par.

225.    Determining the value of the no-AG agreement from Glenmark and Par's perspective requires estimating the additional sales Glenmark/Par made during the six-month generic exclusivity period in 2016 compared to the sales it would have made in the first six months of generic competition starting in December 2011 when, without the benefit of the no-AG agreement, it would have faced competition from Merck's authorized generic.

226.    Under competitive conditions, the calculation of Glenmark/Par's sales during the first six months of generic competition starting in December 2011 is identical to the calculation for Merck's AG during this period, because the same assumptions apply to Glenmark/Par's generic as to Merck's. Thus the value of generic sales by Glenmark/Par in 2011, facing competition from Merck's AG, would have been approximately $129.8 million. How Glenmark and Par's agreement splits profits between them does not change this overall value, only its proportional allocation between them.

227.    Under the anticompetitive conditions of the no-AG promise, however, Glenmark and Par stood in a far better position financially. They would now (a) get 100% (not 50%) of the generic sales in the first six months of generic launch (because there was no authorized generic taking market share); (b) be able to sell that generic during those months for about 90% (not 50%) of the branded price (because there was no authorized generic driving down price); and (c) be able to have their generic product enter a market that had grown in size over the five-year delay period. Indeed, by 2016 annual sales of branded Zetia had grown to $2.6 billion.

228.    Without competition from Merck's authorized generic, Glenmark/Par could expect to capture 80% of sales of Zetia and its AB-rated generic equivalents in 2016, and likely priced their generic at about 90% of branded Zetia's price. As a result, during its six-month exclusivity period in 2016, without competition from Merck's authorized generic, Glenmark/Par likely realized about $936 million in generic sales ($2.6 billion times 0.5 [half a year] times 0.8 [generic penetration] times 0.9 [generic price]).

229.    This means the agreement with Merck to delay Glenmark's launch of generic Zetia until December 2016 was worth approximately $806 million in additional sales to Glenmark/Par, compared to sales they would have made beginning in December 2011 without the benefit of the no-AG agreement ($936 million less $129.8 million). The no-AG payment from Merck to Glenmark made delayed generic entry very lucrative for Glenmark and Par.

230.    Even if Merck, Glenmark, and Par did not foresee the meteoric rise in the sales of the branded product between 2011 and 2016, the no-AG promise was still a lucrative one for Glenmark and Par from that pessimistic perspective in 2011. If one assumes that the sales of branded Zetia remained flat at 2010 levels (when the parties entered into their reverse payment agreement) until Glenmark/Par entered with its generic in 2016, the no-AG promise was still worth an additional $225 million to Glenmark and Par over what they would have made launching their generic in December 2011.[50] Whether or not one assumes that the sales of branded Zetia would have remained flat at 2010 levels, the no-AG pact unlawfully delivered to Glenmark more than it could have obtained even if it had won the patent infringement litigation, and to Par more than it could have obtained as exclusive licensee of Glenmark's.

---

[50] $985,823,000 (2010 brand sales) times 0.5 (six months) times 0.8 (generic penetration) times 0.9 (generic price) = $354,896,280 − $129,891,200 = $225,005,080.

### L.    After Settling With Glenmark Merck Seeks Another Reissue and Sues More Generics.

#### 1.    Merck admits invalidity and seeks reissue of the RE'721 patent.

231.    On June 9, 2010, within a month after its settlement with Glenmark, Merck applied to the PTO for reissuance of the RE'721 patent. Again, to obtain reissue, the applicant must identify an error and attest, under oath, that the original patent is wholly or partly inoperative or invalid. In spite of the fact that it had pursued an infringement case against Glenmark almost to trial, Merck and its agents admitted that the RE'721 patent was invalid, citing inherent anticipation as the reason (as Glenmark had argued).

232.    In the required declaration accompanying its reissue application, Mark Russell, legal director of patents for Schering Corporation, attested to an error, and conceded that Glenmark's inherent anticipation argument was correct:

- "I have reviewed and understand the content of the above identified specification, including the claims . . . ."

- "I verily believe the original patent to be wholly or partly inoperative or invalid, for the reasons described below…by reason of the patentee claiming more than he had the right to claim in the patent."

- "At least one error upon which reissue is based is described as follows: At least one claim of RE37,721 E is potentially inherently anticipated by International published patent application WO 93/02048, filed July 21, 1992 (PCT/US92/05972) and published February 4, 1993 ("the '048 PCT publication"). See also European patent application EP 0524595 A1. In infringement litigation involving RE37,721 E, defendants have alleged that the PCT'048 publication recites, in Example 9, a compound, that when administered to mammals, as also reported in the PCT'048 publication, metabolizes into one or more compounds that fall within the scope of at least claims 1 of RE37,721 E."

- "I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application, any patent issuing thereon, or any patent to which this declaration is directed."

233.    In Merck's preliminary remarks to the PTO, Merck's attorneys made similar statements about inherent anticipation and invalidity being the basis for seeking reissue, and proposed amendments to the claims that ostensibly addressed these problems, namely cancelling claims 1-2 and 4-6 and amending claims 3 and 7-9 of the RE'721 patent.

### 2.    Merck sues Mylan and Teva for infringing the RE'721 patent; both counterclaim.

#### a.    The *Mylan* litigation.

234.    In or about April 2010, Mylan Pharmaceuticals, Inc. became the second company to file a paragraph IV ANDA for generic ezetimibe.

235.    Mylan sent its paragraph IV notice for Zetia to Merck on May 25, 2010.

236.    As discussed above, on June 16, 2010—despite admitting to the PTO only one week earlier that the RE'721 patent was likely invalid—Merck sued Mylan for infringement of the RE'721 patent.[51]

237.    Mylan counterclaimed, seeking declarations that both patents were invalid and unenforceable, also asserting claims for damages under the federal antitrust laws and state unjust enrichment laws. Mylan raised many of the arguments initially raised by Glenmark.

#### b.    The *Teva* litigation.

238.    On July 21, 2010, Teva Pharmaceuticals notified Merck that Teva had filed ANDA 78-724 for approval to make generic Zetia, including a paragraph IV certification that the listed patents were invalid and unenforceable.

---

[51] Merck initially asserted that Mylan's Zetia product infringed the '966 patent, but withdrew that allegation part way through the litigation. Mylan had earlier filed an ANDA for Vytorin, a Merck product also marketed to combat high cholesterol that includes ezetimibe as one of two active ingredients. Merck's patent infringement suit against Mylan claiming infringement of the RE'721 and '966 patents by the Vytorin ANDA had been filed in December of 2009, and was pending before Hon. Jose L. Linares in the District of New Jersey at the time of the Merck-Glenmark settlement. The Vytorin and Zetia cases against Mylan were consolidated for all purposes in September 2010.

239.    On September 1, 2010—again, after it had admitted to the PTO that the RE'721 patent was likely invalid—Merck filed suit against Teva for infringement of the '966 and RE'721 patents in the District of New Jersey. Later that month, Merck formally agreed not to assert the '106 and '058 patents against Teva.

### 3.    The Federal Circuit functionally overturns the *Glenmark* "error" summary judgment decision.

240.    In April 2011, shortly before the '115 patent was reissued for a second time, the Court of Appeals for the Federal Circuit reversed the Board of Patent Appeals and Interferences' ruling in *Ex parte Tanaka*. In *Tanaka*, the Federal Circuit recognized "the narrow rule" permitting applicants to add "dependent claims as a hedge against possible invalidity," noting that this rule "has been embraced as a reasonable interpretation of the reissue statute by this court and its predecessor for nearly fifty years."[52]

241.    While this decision effectively overturned the rationale behind the earlier Glenmark summary judgment about the technical requirements for invoking the reissue statute, it did not in any way undermine any of Glenmark's other arguments regarding invalidity or unenforceability of the RE'721.

### 4.    Merck obtains reissuance of RE'721 patent (RE'461).

242.    On June 14, 2011, the RE'721 patent was reissued as U.S. Patent No. RE42,461.

243.    The RE'461 patent as reissued (or as re-reissued in this case) included only claims 8 through 13, and parts of claims 3 and 7, of the RE'721 patent.

---

[52] *In re Tanaka*, 640 F.3d 1246, 1251-52 (Fed. Cir. 2011).

### 5.    The Mylan and Teva litigations resolve.

#### a.    Schering and Teva settle.

244.    On July 7, 2011, Merck settled with Teva before any substantive rulings in the case and while Merck's parallel case against Mylan was pending. The district court entered a consent judgment that prohibited Teva from launching generic Zetia before April 25, 2017. Teva admitted that the RE'461 patent was valid and would be infringed by its generic product. No other terms of the settlement were made public.

#### b.    The court denies Merck's motion for summary judgment of inequitable conduct.

245.    On July 25, 2011, Merck filed an amended complaint against Mylan, substituting the newly reissued RE'461 patent for the RE'721 patent.

246.    On August 19, 2011, Mylan filed an answer, affirmative defenses and counterclaims to Merck's amended complaint. In addition to invalidity based on inherent anticipation and unenforceability based on failure to disclose prior art, Mylan also alleged that the patents were unenforceable because of an intentional failure to disclose one of the inventors of ezetimibe.

247.    On August 22, 2011, the court denied Merck's motion for judgment on Mylan's defense of inequitable conduct based on Merck's failure to "disclose to the PTO that several of the compounds claimed in the '721 and '966 patents were metabolites of a prior art compound, SCH48461." The court held that "Mylan has put forth sufficient indirect and circumstantial evidence from which a reasonable fact finder could conclude that Schering had knowledge of the

materiality of the withheld prior art," and that "a deliberate decision to withhold that information could…be reasonably inferred from the evidence already presented."[53]

248.    On the same day, the court granted in part Merck's motion for summary judgment against Mylan, ruling that Mylan's ANDA did infringe claims 3, 10, 11, and 12.

249.    On September 30, 2011, Merck indicated that it would no longer be asserting any claims of the '966 patent against Mylan.

250.    On November 18, 2011, Mylan sent a letter to the Court confirming that it would be withdrawing a defense, namely its claim "based on the non-disclosure of information demonstrating a relationship between compounds claimed in predecessor patents and metabolites of a prior art compound." This withdrawal "thereby reduc[ed] the issues to be tried before the Court on December 5, 2011." Mylan explained that this was done "in the interest of further streamlining the issues remaining for trial" and "having considered the time allotted by the Court for presentation of issues by the parties." Mylan also specifically clarified that it had "not withdrawn its additional defenses based on inequitable conduct, including those related to improper inventorship."

251.    Mylan's choice to pursue the inventorship issue rather than other arguments raised earlier in the litigation does not reflect the relative substantive merits of those argument/defenses, or even Mylan's own evaluation of them. Instead, the choice reflected the fact that Mylan had a limited amount of time to present its case, so Mylan picked a single, discrete inequitable conduct issue to try. Given that the RE'461 patent no longer contained the claims of the RE'721 to which the inherent anticipation defense applied (which claims had been cancelled during the reexamination process), Mylan may have made a calculated decision, based

---

[53] The court also noted that "Schering does not appear to dispute that it had knowledge of the metabolite information during prosecution."

on cost and resources, to pursue another inequitable conduct argument that related to the all claims of the RE'461 patent then at issue. However, a finding of inequitable conduct with respect to even cancelled claims would have rendered the entire RE'461 patent invalid.

### 6.    After a trial, the *Mylan* court found no inequitable conduct on inventorship (only).

252.    The court held a bench trial in December 2011, solely on the issue of the claimed unenforceability of the RE'461 patent due to Merck's alleged inequitable conduct based on Merck's alleged misrepresentation of the inventorship of the RE'461 patent. The trial did not address any allegations that the RE'461 patent was invalid as obvious over inherently anticipating prior art, or any allegations of inequitable conduct based on Merck's failure to disclose invalidating prior art.

253.    On April 27, 2012, the court ruled that Mylan had failed to prove inequitable conduct on the inventorship issue and therefore that the RE'461 patent was not invalid or unenforceable on that basis.[54]

254.    While the court found no intent to deceive the PTO with respect to inventorship issues, the court made a factual finding highly relevant to Plaintiff's antitrust claims in this case. The court found that "the evidence indicates that [Merck's] attorneys believed the metabolite-related error was a sufficient basis to invoke a reissue as had been demonstrated to them during the Glenmark litigation." In other words, the court found that the evidence indicated that, at the time the no-AG agreement was entered into, Merck believed Glenmark's inherent anticipation argument was truly an existential threat to its billion-dollar Zetia monopoly.[55]

---

[54] Mylan appealed the verdict, but on February 7, 2013 the Federal Circuit Court of Appeals affirmed.
[55] After the trial, on August 7, 2013, Mylan's ANDA for Zetia received tentative approval from the FDA. To date, Mylan has not launched a generic version of Zetia in the U.S.

7.    **Schering sues Sandoz; Sandoz counterclaims; the parties settle.**

255.    In August 2012, Sandoz notified Merck that Sandoz had filed ANDA 203-931 for approval to market generic Zetia. On September 27, 2012, Merck sued Sandoz for infringement of the RE'461 patent in the District of New Jersey. In its amended complaint filed May 29, 2013, Merck alleged that the purpose of Sandoz's ANDA submission was to obtain permission under the FDCA to engage in the commercial manufacture, use, offer for sale, and/or sale of Sandoz's generic Zetia prior to the expiration of the RE'461, '966, '106, and '058 patents. In its answer to the amended complaint filed July 26, 2013, Sandoz admitted that it had sought approval to manufacture and sell generic Zetia prior to the expiration of those patents, and further admitted that Sandoz intended to manufacture and sell generic Zetia "immediately and imminently upon approval of ANDA No. 203931 in light of potential third party exclusivity rights." Sandoz pleaded affirmative defenses including the unenforceability and invalidity of the RE'461 patent. Sandoz also counterclaimed for a declaratory judgment of the unenforceability of the RE'721 and RE'461 patents, and the invalidity and Sandoz's non-infringement of one or more of the claims of those two patents as well as the '106 and '058 patents. Sandoz alleged, inter alia, that all the claims of the RE'721 and RE'461 patents were unenforceable due to inequitable conduct because Merck had "failed to disclose publications concerning metabolites of a prior art compound (compound SCH 48461)." Specifically, Sandoz alleged that the publications Merck withheld during prosecution of the RE'721 and RE'461 patents described "metabolic studies of SCH 48461 from which the examiner could determine the structure of metabolites of SCH 48461, and that relevant metabolites were inherently formed by the preparation and administration of SCH 48461, as disclosed in [the PCT'048] patent." Sandoz also alleged that the Van Heek 1997 article had claimed the discovery of ezetimibe in conjunction with Dr. Rosenblum in 1995, and described the "large chemical synthesis program [that] evolved to

discover a more potent backup compound for SCH 48461," including the addition of "[a] benzylic hydroxyl group … to SCH 53695 and several sites that were readily metabolized in SCH 48461 were blocked with fluorines resulting in [ezetimibe]." Sandoz additionally averred that the Dugar 1996 article, the Rosenblum I 1995 abstract, and the other prior art publications discussed above had specifically disclosed that two disclosed compounds, dubbed compound 57a and compound 58, were metabolites of SCH 48461 and thus inherently disclosed by the teachings of the prior art PCT'048 patent.

256.    On September 3, 2013, the court ordered Sandoz to provide its ANDA to Merck by September 6, 2016 (ECF 46), and ordered Merck to file its response to Sandoz's counterclaims on or before September 17, 2013.

257.    On September 5, 2013, before the pleadings in the case were closed, and before any further proceedings or any substantive rulings in the case, Merck and Sandoz settled all issues in the patent infringement litigation. The district court entered a consent judgment prohibiting Sandoz from launching generic Zetia before April 25, 2017, and Sandoz admitted that the RE'421 patent was valid and would be infringed by its generic product. No other terms of the settlement were made public.

**M.    In 2016 Glenmark and Par Launch a Generic Form of Zetia; Merck Does Not.**

258.    Glenmark's ANDA 78-560 received final FDA approval on June 26, 2015. In its final approval letter, the FDA reconfirmed that Glenmark was entitled to 180-days of market exclusivity upon launch.

259.    On December 12, 2016, Glenmark, through Par, launched its generic ezetimibe, which Glenmark's press release of that date described as "the first and only generic version" of Zetia in the United States.

260.    From December 12, 2016, through June 12, 2017, Par's product was the only generic version of Zetia sold in the U.S. market.

261.    Merck refrained from launching an authorized generic version of Zetia during Glenmark's 180-day exclusivity period. It did so pursuant to the no-AG pact in the parties' unlawful agreement.[56]

### N.    180 Days Later, Five More Generics Launch.

262.    On or about June 12, 2017—the day Glenmark's period of exclusivity expired— the FDA approved ANDAs for generic Zetia previously filed by seven competitor companies: Teva (ANDA 78-724), Sandoz (ANDA 203-931), Amneal (ANDA 208803), Apotex (ANDA 208332), Ohm Laboratories (ANDA 207311), Zydus (ANDA 204331), and Watson Laboratories (ANDA 200831).

263.    Five of these manufacturers—Teva, Sandoz, Amneal, Apotex and Ohm Laboratories—launched a generic Zetia product in June 2017, shortly after receiving FDA approval. Zydus launched its generic Zetia product in August 2017. (Watson Laboratories had sold its generic drug business to Teva before June 2017 and so did not launch a generic Zetia product.)

264.    An eighth ANDA, filed by Aurobindo (ANDA 209838), was approved in August 2017 and launched the same month. An additional ANDA, filed by Alkem Laboratories (ANDA 209234), was approved in December 2017.

---

[56] Merck did not launch an authorized generic at the end of Glenmark's 180-day exclusivity in June 2017. But the economics for Merck *after* Glenmark's 180-day exclusivity were radically different than the economics for Merck would have been (absent the unlawful no-AG pact) *during* that exclusivity. After the exclusivity, Merck's authorized generic would have been one of at least seven generics on the market, competing for a margin driven down to near marginal cost. During Glenmark's exclusivity, as noted in detail above, a Merck authorized generic would have been one of only two generics on the market, taking at least half the sales at margins that would have yielded more than a hundred million dollars in profits.

265.    Whereas only brand-name Zetia tablets were available to purchasers and consumers before December 2016, and only brand-name Zetia and Glenmark/Par's generic tablets were available from December 2016 to June 2017, by July of 2017 there were six generics available to purchasers and consumers in addition to brand tablets, and by September of 2017 there were eight generics in addition to brand tablets.

266.    The average retail price of ezetimibe tablets dropped from $10 per pill before Glenmark/Par's launch, to less than $1 per pill as of December 1, 2017, a 90% decrease.

267.    Absent the no-AG promise, Merck would have launched an authorized generic during Glenmark's 180-day exclusivity period, taking approximately 50% of Glenmark/Par's generic sales and substantially lowering the price that drug purchasers paid for generic Zetia. Absent the no-AG promise, Glenmark and Par would not have agreed to delay their launch until December 12, 2016 and instead would have entered the market, through Par, much sooner than it did, as early as December 6, 2011. Additional generics would have entered the market six months later and further driven down prices.

268.    The settlement with Glenmark enabled Merck to continue to receive monopoly profits until December 12, 2016 and enabled Glenmark and Par to control the generic market for 180 days thereafter, with Glenmark and Par sharing in the monopoly profits that the reciprocal non-competition pact made possible. The reverse payment agreement not only delayed Glenmark/Par's own entry into the market, it also created a bottleneck that blocked all other would-be generic Zetia competitors by postponing the start (and thus also the conclusion) of Glenmark's 180-day first filer exclusivity period. Absent Glenmark's unlawful agreement to delay its entry until December 12, 2016, generic manufacturers would have filed their ANDA

applications earlier and would have been ready, willing, and able to enter the market on whatever earlier date Glenmark's 180-day exclusivity expired.

269.    The Merck-Glenmark agreement was collusive and intended to maintain a monopoly and allocate the market.

270.    Par knew of this agreement and actively maintained its licensing agreement with Glenmark; did not renege on or abandon that licensing agreement despite its anticompetitive taint; sold, distributed, and marketed generic Zetia in what it knew were market conditions created by a settlement agreement designed to suppress competition; conspired with Glenmark and committed resources to maintain the generic Zetia monopoly; and reaped its share of the monopoly rents.

271.    Merck and Glenmark could not have implemented their scheme without acquiescence or agreement from Par.

**O.    The No-AG Promise Was a Large Reverse Payment.**

272.    The no-AG payment to Glenmark was large, estimated to be worth more than $800 million. It far exceeded any estimate of the litigation expenses Merck saved by settling the patent case with Glenmark.[57]

273.    The value of the reverse payment agreement to Merck, estimated to be up to $9 billion, was far greater even than the value to Glenmark, because the years-long delay in generic entry protected Merck's monopoly sales volume and pricing over that time.

274.    Merck's reverse payment to Glenmark guaranteed two distinct periods of non-competition: (a) the period before generic competition, wherein Merck and Glenmark allocated

---

[57] One 2015 survey of the cost of patent litigation found that litigation expenses for a case such as the one between Merck and Glenmark range from $3.7 million to $6.3 million. *AIPLA 2015 Report of the Economic Survey*, IPICS, http://www.patentinsuranceonline.com/wp-content/uploads/2016/02/AIPLA-2015-Report-of-the-Economic-Survey.pdf (last visited Jan. 11, 2018).

100% of the market to Merck; and (b) the 180-day exclusivity period after Glenmark/Par's entry, wherein Merck and Glenmark allocated 100% of generic sales to Glenmark/Par. So consumers were overcharged twice: before Glenmark/Par's entry, they were forced to pay overcharges for branded Zetia (including overcharges aimed at diverting them to Vytorin that Merck would not have been able to sustain had Glenmark/Par entered); and during Glenmark/Par's exclusivity period were forced to pay additional overcharges for branded Zetia and generic Zetia. And the unlawful agreement had the additional anticompetitive effect of delaying the entry of all of the other generic competitors.

275.    Defendants have no procompetitive explanation or justification for the reverse payment agreement.

## VIII.    THE SCHEME'S EFFECTS ON COMPETITION AND HARM TO TID AND THE CLASSES

276.    Merck's U.S. sales of Zetia were approximately $1.3 billion in 2010, $1.4 billion in 2012, $1.5 billion in 2014, and $2.6 billion in 2016. These amounts represent billions of dollars more in sales than Merck would have achieved absent the defendants' unlawful scheme to impair generic competition. Generic Zetia products would have been priced at a fraction of the cost of branded Zetia, and would have quickly captured the vast majority of the market for ezetimibe.

277.    Merck's and Glenmark's unlawful agreement impaired and delayed the sale of generic Zetia in the United States and unlawfully enabled Merck to sell its branded Zetia at artificially inflated prices, and then allowed Glenmark and Par to sell their generic Zetia at artificially inflated prices. But for Merck's unlawful conduct, generic competitors would have been able to compete, unimpeded, with their own generic versions of Zetia, at a much earlier date.

278.    But for Defendants' anticompetitive conduct, TID and other members of the Classes would have: (1) purchased lower-priced generic, AB-rated Zetia, instead of the higher-priced brand Zetia, during the period when Glenmark and Par delayed their entry to the market; (2) paid a lower price for generic Zetia products during Glenmark's 180-day exclusivity period; and (3) paid lower prices for generic Zetia products, as a result of the entry of generics at an earlier date, sooner.

279.    As a consequence, TID and other indirect purchasers have sustained substantial losses and damage to their business and property in the form of overcharges, the exact amount of which will be the subject of proof at trial.

## IX.    MARKET POWER AND DEFINITION

280.    The pharmaceutical marketplace is characterized by a "disconnect" between product selection and the payment obligation. State laws prohibit pharmacists from dispensing many pharmaceutical products, including Zetia, to patients without a prescription. The prohibition on dispensing certain products without a prescription creates this disconnect. The patient's doctor chooses which product the patient will buy while the patient (and in most cases his or her insurer) has the obligation to pay for the product. Thus, any switching of a given patient away from Zetia would likely be driven largely by their doctor.

281.    Brand manufacturers, including Merck, exploit this price disconnect by employing large sales forces that visit doctors' offices and persuade them to prescribe the brand manufacturers' products. These sales representatives do not advise doctors of the cost of the branded products. Studies show that doctors typically are not aware of the relative costs of brand pharmaceuticals and, even when they are aware of the relative costs, they are largely insensitive to price differences because they do not pay for the products. The result is a marketplace in which price plays a comparatively unimportant role in selection between branded products.

282.    The lack of both visibility of, and sensitivity to, price in the pharmaceutical marketplace reduces what economists call the price elasticity of demand—the extent to which unit sales go down when price goes up. This reduced price elasticity, in turn, gives brand manufacturers the ability to raise price substantially above marginal cost without losing so many sales as to make the price increase unprofitable. The ability to profitably raise prices substantially above marginal costs without losing sales sufficient to defeat the price increases is what economists and antitrust courts refer to as market or monopoly power. The result of these pharmaceutical-market imperfections and marketing practices is that brand manufacturers gain and maintain market power with respect to many branded prescription pharmaceuticals, including Zetia.

283.    Before December 12, 2016, Merck had monopoly power in the market for Zetia and its AB-rated generic equivalents because it had the power to exclude competition and/or raise or maintain supracompetitive prices without losing enough sales to make those prices unprofitable. From December 12, 2016 to June 12, 2017, Merck and Glenmark/Par combined had substantial market power in the market for Zetia and its generic equivalent, because they had the power to exclude competition and/or raise or maintain the price of ezetimibe at supracompetitive levels without losing enough sales to make supracompetitive prices unprofitable.

284.    At all relevant times, a small but significant, non-transitory increase to the price of Zetia and its AB-rated generic equivalents would not have caused a loss of sales sufficient to make that increase unprofitable.

285.    Other ezetimibe products or treatments for hypercholesterolemia are not economic substitutes for Zetia and its AB-rated generic equivalents. As an economist might put

it, brand Zetia does not exhibit significant, positive cross-elasticity of demand with respect to price with any other than AB-rated generic versions of Zetia.

286. Brand Zetia is differentiated from all other ezetimibe products, and all other hypercholesterolemia treatments, other than the AB-rated generic versions of brand Zetia, meaning it has at least some market power even relative to other ezetimibe products. This "differentiation" is attributable to the reputation effects of branding and other factors.

287. Merck (and, later, Merck, Glenmark, and Par) needed to control only brand Zetia and its AB-rated generic equivalents, and no other products, to maintain supracompetitive prices. Only the market entry of competing, AB-rated generic versions would render Defendants unable to profitably maintain their prices for Zetia and its AB-rated generic equivalents—of which Glenmark/Par's was the only one during the 180-day exclusion period—without losing substantial sales.

288. During the 180-day exclusion period, Merck sold brand Zetia and Par sold generic Zetia at prices well in excess of marginal costs and in excess of the competitive price, and, therefore, Merck, Glenmark, and Par (splitting profits with Glenmark) enjoyed high profit margins.

289. Defendants had, and exercised, the power to exclude generic competition to Zetia and its AB-rated generic equivalents.

290. At all material times, high barriers to entry, including regulatory protections and high costs of entry and expansion, protected branded Zetia and, in turn, Glenmark/Par's generic Zetia, from the forces of price competition.

291. Direct evidence of market power and anticompetitive effects available in this case obviates the need to establish a relevant antitrust market. This direct evidence of Defendants'

ability to control the price of Zetia and generic Zetia, and to exclude ready, willing entrants, consists of, inter alia, the following facts: (a) Merck's gross margin on Zetia (including the costs of ongoing research/development and marketing) at all relevant times was very high; (b) Merck never lowered the price of Zetia to the competitive level in response to the pricing of other brand or generic drugs other than the AB-rated generic Zetia; and (c) a generic Zetia seller would have entered the market at a much earlier date, at a substantial discount to brand Zetia, but for Defendants' anticompetitive conduct.

292.    To the extent proof of monopoly power by defining a relevant product market is required, Plaintiff alleges that the relevant antitrust market is the market for Zetia and its AB-rated generic equivalents.

293.    The United States, the District of Columbia, and the U.S. territories constitute the relevant geographic market.

294.    Merck's market share in the relevant market was 100% until December 12, 2016, after which Merck, Glenmark, and Par collectively had 100% market share in the relevant market until June of 2017, when Teva, Mylan, Sandoz, Amneal, Apotex, Ohm Laboratories/Sun Pharmaceuticals, Zydus, and Watson Laboratories all launched generic Zetia products.

## X.    ANTICOMPETITIVE EFFECTS

295.    Defendants willfully and unlawfully maintained their market power by engaging in a conspiracy to exclude competition. Defendants designed a scheme to delay competition on the merits, to further Merck's anticompetitive purpose of forestalling generic competition against Zetia, in which Glenmark and Par cooperated to increase their own profits. Merck, Glenmark, and Par carried out the scheme with the anticompetitive intent and effect of maintaining supracompetitive prices for ezetimibe tablets.

-75-

296.    Defendants' acts and practices had the purpose and effect of restraining competition unreasonably and injuring competition by protecting brand Zetia, and later Glenmark and Par's generic Zetia, from competition. These actions allowed Defendants to maintain a monopoly and exclude competition in the market for Zetia and its AB-rated generic equivalents, to the detriment of Plaintiff and all other members of the Classes.

297.    Defendants' exclusionary conduct delayed generic competition and unlawfully enabled Merck, Glenmark, and Par to sell Zetia without further generic competition. Were it not for Defendants' illegal conduct, one or more additional generic versions of Zetia would have entered the market sooner, and Glenmark/Par's generic would have faced competition during Glenmark's 180-day exclusivity period from a Merck authorized generic.

298.    Defendants' illegal acts and conspiracy to delay generic competition for Zetia caused TID and all members of the Classes to pay more than they would have paid for ezetimibe absent this illegal conduct.

299.    If generic competitors had not been unlawfully prevented from entering the market earlier and competing in the relevant markets, indirect purchasers, such as TID and members of the Classes, would have paid less for ezetimibe by (a) paying lower prices on their remaining brand purchases of Zetia, (b) substituting purchases of less-expensive generic Zetia for their purchases of more-expensive brand Zetia, and/or (c) purchasing generic Zetia at lower prices sooner.

300.    Thus, Defendants' unlawful conduct deprived TID and members of the Classes of the benefits from the competition that the antitrust laws are designed to ensure.

XI.    **ANTITRUST IMPACT AND INTERSTATE COMMERCE**

301.    During the relevant time period, Defendants manufactured, sold, and shipped Zetia and generic Zetia across state lines in an uninterrupted flow of interstate commerce.

302.    During the relevant time period, TID and members of the Classes purchased substantial amounts of Zetia and/or generic Zetia indirectly from Defendants. As a result of Defendants' illegal conduct, TID and members of the Classes have sustained substantial losses and damage to their business and property in the form of overcharges. The full amount and forms and components of such damages will be calculated after discovery and upon proof at trial.

303.    During the relevant time period, Defendants used various devices to effectuate the illegal acts alleged herein, including the United States mail, interstate and foreign travel, and interstate and foreign wire commerce. All Defendants engaged in illegal activities, as charged in herein, within the flow of, and substantially affecting, interstate commerce.

304.    During the class period, each Defendant, or one or more of each Defendant's affiliates, used the instrumentalities of interstate commerce to join or effectuate the scheme. The conspiracy in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

XII.    **DEFENDANTS' FRAUDULENT CONCEALMENT TOLLED THE APPLICABLE STATUTES OF LIMITATIONS AND DELAYED ACCRUAL OF TID's CAUSES OF ACTION**

305.    A cause of action accrued for TID and the Classes each time TID paid for or reimbursed a purchase of Zetia or its generic equivalent at a supracompetitive price made possible by their anticompetitive conduct. The December 2016 launch by Par/Glenmark, Merck's forgoing a launch of an AG since then, and each sale by Defendants of a product at a supracompetitive constitute overt acts in furtherance of their anticompetitive scheme. Accordingly, TID and the Classes are entitled to recover all damages on all sales that Defendants made to them at supracompetitive prices.

306.    Due to Defendants' concealment of the terms of the Merck-Glenmark settlement, TID and members of the Damages Class are entitled to recover damages reaching back beyond

-77-

any limitations periods otherwise applicable to their claims, because the earliest they could

reasonably have learned of Defendants' conspiracy was in December 2016, when Par/Glenmark

began selling generic Zetia and Merck did not respond with an AG. Merck, Glenmark, and Par

had earlier disclosed only cursory information about the existence of the settlement. TID and

members of the Classes had no knowledge of Defendants' unlawful scheme and could not have

discovered the scheme and conspiracy through the exercise of reasonable diligence, nor did they

have the facts or information that would have caused a reasonably diligent person to investigate

whether a conspiracy existed, or believe in good faith that a violation had been committed, until

December 2016.

307.    This is true because of the nature of Defendants' scheme was self-concealing and

because Defendants employed deceptive tactics and techniques of secrecy to avoid detection of,

and to conceal, their contract, combination, conspiracy and scheme.

308.    Defendants and co-conspirators wrongfully and affirmatively concealed the

existence of their ongoing combination and conspiracy from TID and members of the Classes by,

among other things:

a.    Concealing the fact of Merck's agreement not to launch a competing

authorized generic Zetia product in exchange for Glenmark's agreement, with Par's knowing

acquiescence, not to market its competing generic product until December 12, 2016;

b.    Concealing the fact that the purpose of the no-AG agreement was to

provide compensation in connection with the settlement of the patent litigation and the

December 2016 entry date for Glenmark/Par's generic product; and

c.    Filing documents with the United States Securities and Exchange

Commission that failed to disclose the existence or nature of the payments made.

309.    As a result of the Defendants' fraudulent concealment, all applicable statutes of limitations affecting the TID's and Class members' claims have been tolled, and the accrual of TID and Class members' causes of action have been delayed.

## XIII.    CLAIMS FOR RELIEF

### COUNT ONE—VIOLATION OF 15 U.S.C. § 1
### (On Behalf of TID and the Nationwide Injunctive Relief Class)

310.    TID hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

311.    Merck and Glenmark violated 15 U.S.C. § 1 by entering into an unlawful reverse payment agreement that restrained competition in the market for Zetia and its AB-rated generic equivalents.

312.    Par violated 15 U.S.C. § 1 by furthering the unlawful reverse payment agreement's objective to restrain competition in the market for Zetia and its AB-rated generic equivalents.

313.    Indirect purchasers have been injured in their business or property by the violation of 15 U.S.C. § 1. The indirect purchasers' injury consists of having paid higher prices for their ezetimibe requirements than they would have paid in the absence of those violations. Such injury, called "overcharges," is of the type that the antitrust laws were designed to prevent, and it flows from that which makes the Defendants' conduct unlawful. TID is the proper entity to bring a case concerning this conduct.

314.    From the launch of brand Zetia in 2002 through December 12, 2016, Merck possessed monopoly power in the relevant market—*i.e.*, the market for sales of ezetimibe in the United States. But for Defendants' wrongful conduct, as alleged herein, Merck should have lost

its monopoly power in the relevant market as early as December 6, 2011 and in any event well before December 12, 2016.

315.    On or about May 10, 2010, Merck and Glenmark entered into a reverse payment agreement, a continuing illegal contract, combination, and restraint of trade under which Merck paid Glenmark substantial consideration in exchange for Glenmark's agreeing to delay bringing its generic version of Zetia to the market. Par knowingly acquiesced to, was consciously committed to, and furthered this illegal contract, combination, and restraint of trade. The purpose and effect of the agreements between Defendants were to: (a) delay generic entry of Zetia in order to lengthen the period in which Merck's brand Zetia could monopolize the market and make supracompetitive profits; (b) keep an authorized generic off the market during Glenmark's 180-day generic exclusivity period, thereby allowing Glenmark and Par to monopolize the generic market for Zetia during that period, and allowing Glenmark and Par to make supracompetitive profits; and (c) raise and maintain the prices that TID and other members of the Classes would pay for Zetia at supracompetitive levels until at least June 12, 2017.

316.    From December 12, 2016 through June 12, 2017, Merck shared its monopoly power with Glenmark and Par, and the three companies jointly maintained an illegal monopoly throughout that time.

317.    The May 2010 reverse payment agreement covered a sufficiently substantial percentage of the relevant market to harm competition.

318.    Merck, Glenmark, and Par are liable for this reverse payment agreement under a "rule of reason" standard under the antitrust laws.

319.    There is and was no legitimate, non-pretextual, procompetitive business justification for this reverse payment agreement that outweighs its harmful effect on indirect

purchasers and competition. Even if there were some conceivable and cognizable justification, the payment was not necessary to achieve such a purpose.

320.    As a direct and proximate result of Merck's, Glenmark's, and Par's anticompetitive conduct, including the reverse payment, TID was harmed.

## COUNT TWO—VIOLATION OF 15 U.S.C. § 2
### (On Behalf of TID and the Nationwide Injunctive Relief Class)

321.    TID hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

322.    Merck, Glenmark, and Par entered into a conspiracy to monopolize in violation of 15 U.S.C. § 2 by having Merck and Glenmark into the reverse payment agreement inuring to the benefit of Merck, Glenmark, and Par.

323.    Indirect purchasers have been injured in their business or property by the violation of 15 U.S.C. § 2. Such injury consists of having paid higher prices for their ezetimibe requirements than they would have paid in the absence of those violations. Such injury is of the type antitrust laws were designed to prevent, and it flows from that which makes Defendants' conduct unlawful. TID is the proper entity to bring a case concerning this conduct.

## COUNT THREE—VIOLATION OF STATE ANTITRUST LAWS[58]
### (On Behalf of TID and the Damages Class)

324.    TID hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

325.    At all relevant times, Merck, Glenmark, and Par possessed substantial market power (*i.e.*, monopoly power) in the relevant market. Merck, Glenmark, and Par possessed the

---

[58] Statutory antitrust violations are alleged herein for the following jurisdictions: Alabama, Arizona, California, District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, Puerto Rico, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin.

power to control prices in, prevent prices from falling in, and exclude competitors from, the relevant market.

326.    Through their conspiracy, Merck, Glenmark, and Par willfully maintained their monopoly power in the relevant market using restrictive or exclusionary conduct, rather than by means of greater business acumen, and thereby injured competition, TID, and the Classes.

327.    TID and members of the Damages Class have been injured in their business or property by Merck's, Glenmark's, and Par's antitrust violations. Their injury consists of having paid higher prices for their ezetimibe requirements than they would have paid in the absence of those violations.

328.    It was Merck's, Glenmark's, and Par's conscious objective to further their dominance in the relevant market by and through their conspiracy.

329.    There is no valid procompetitive business justification for Merck's, Glenmark's, and Par's anticompetitive conduct, and to the extent any of them offers one, it is pretextual and not cognizable, and any procompetitive benefits of Merck's, Glenmark's, and Par's conduct do not outweigh its anticompetitive harms.

330.    By engaging in the foregoing conduct, Merck, Glenmark, and Par have intentionally and wrongfully maintained monopoly power in the relevant market in violation of the following state laws:

**Alabama**

331.    By reason of the foregoing, Merck, Glenmark, and Par have violated Alabama Code § 6-5-60. TID on behalf of the Damages Class alleges as follows:

    a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed,

and eliminated within and throughout Alabama; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels within and throughout Alabama; and (3) TID and members of the Damages Class, including those who resided in Alabama and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Alabama.

        b.     During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Alabama commerce.

        c.     As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.     By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Alabama Code § 6-5-60. Accordingly, TID and members of the Damages Class seek all forms of relief available under Alabama Code § 6-5-60.

**<u>Arizona</u>**

332.    By reason of the foregoing, Merck, Glenmark, and Par have violated Arizona Revised Statutes, §§ 44-1401, *et seq*. TID on behalf of the Damages Class alleges as follows:

        a.     Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for ezetimibe had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Arizona; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Arizona; (3) TID and members of the Damages Class were

deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents.

        b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Arizona commerce.

        c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, the TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.      By reason of the foregoing, Merck, Glenmark, and Par established, maintained, and used a monopoly, and conspired to monopolize and restrain trade, in violation of Arizona Revised Statutes, §§ 44-1401, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Arizona Revised Statutes, §§ 44-1401, *et seq.*

**California**

      333.    By reason of the foregoing, Merck, Glenmark, and Par have violated California Business and Professions Code, §§ 16700, *et seq.* TID on behalf of the Damages Class alleges as follows:

        a.      Merck's, Glenmark's, and Par's combination, trust, or conspiracy was entered in, carried out, effectuated, and perfected within California, and Merck's, Glenmark's, and Par's conduct within California injured TID and members of the Classes throughout the United States. Therefore, this claim for relief under California law is brought on behalf of the Damages Class.

        b.      Beginning at a time currently unknown to TID, but at least as early as May 10, 2010, Merck's, Glenmark's, and Par's engaged in a continuing unlawful combination in restraint of the trade and commerce described above, in violation of California Business and Professions Code § 16720. Merck, Glenmark, and Par have acted in violation of § 16720 to raise,

stabilize, and maintain price of Zetia and its AB-rated generic equivalents at supracompetitive levels.

c.      The aforesaid violations of California Business and Professions Code § 16720 consisted, without limitation, of a continuing unlawful trust, the substantial terms of which were to raise, maintain, and stabilize the price of Zetia and its AB-rated generic equivalents at supracompetitive levels.

d.      For the purpose of forming and effectuating the unlawful trust, Merck, Glenmark, and Par have done those things which they combined and conspired to do, including but not in any way limited to the acts, practices, and course of conduct set forth above and raising and stabilizing the price of Zetia and its AB-rated generic equivalents.

e.      The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of cyclosporine has been restrained, suppressed, and/or eliminated in California; (2) prices for Zetia and its AB-rated generic equivalents have been raised and stabilized at artificially high, noncompetitive levels in California; and (3) those who purchased Zetia and its AB-rated generic equivalents indirectly from Merck, Glenmark, and Par have been deprived of the benefit of free and open competition.

f.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and the members of the Damages Class have been injured in their business and property in that they paid more for ezetimibe than they otherwise would have paid in the absence of Merck's, Glenmark's, and Par's unlawful conduct.  As a result of Merck's, Glenmark's, and Par's violation of California Business and Professions Code § 16720, TID and the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to California Business and Professions Code § 16750(a).

**District of Columbia**

334.    By reason of the foregoing, Merck, Glenmark, and Par have violated District of Columbia Code, §§ 28-4501, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout the District of Columbia; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) TID and members of the Damages Class, including those who resided in the District of Columbia and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in the District of Columbia.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected District of Columbia commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of District of Columbia Code, §§ 28-4501, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under District of Columbia Code, §§ 28-4501, *et seq.*

**Florida**

335.    By reason of the foregoing, Merck, Glenmark, and Par have violated Fla. Stat. §§ 501.201, *et seq*. TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Florida; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Florida; and (3) TID and members of the Damages Class, including those who resided in Florida and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Florida.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Florida commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Florida Statutes, §§ 501.201, *et seq*. Accordingly, TID and members of the Damages Class seek all forms of relief available under Florida Statutes, §§ 501.201, *et seq*.

**Hawaii**

336.    By reason of the foregoing, Merck, Glenmark, and Par have violated Hawaii

Revised Statutes, §§ 480-1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain

trade in the market for Zetia and its AB-rated generic equivalents had the following effects:

(1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed,

and eliminated throughout Hawaii; (2) prices for Zetia and its AB-rated generic equivalents were

raised, maintained, and stabilized at artificially high levels throughout Hawaii; and (3) TID and

members of the Damages Class, including those who resided in Hawaii and/or purchased Zetia

and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were

deprived of free and open competition in, and paid supracompetitive, artificially inflated prices

for, Zetia and its AB-rated generic equivalents, including in Hawaii.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct

substantially affected Hawaii commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's

unlawful conduct, TID and members of the Damages Class have been injured in their business

and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and

entered into an agreement in restraint of, trade in violation of Hawaii Revised Statutes, §§ 480-1,

*et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available

under Hawaii Revised Statutes, §§ 480-1, *et seq.*

**Illinois**

337.    By reason of the foregoing, Merck, Glenmark, and Par have violated the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Illinois; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Illinois; and (3) TID and members of the Damages Class, including those who resided in Illinois and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Illinois.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Illinois commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under the Illinois Antitrust Act, 740 Illinois Compiled Statutes 10/1, *et seq.*

**Iowa**

338.    By reason of the foregoing, Merck, Glenmark, and Par have violated Iowa Code §§ 553.1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Iowa; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Iowa; and (3) TID and members of the Damages Class, including those who resided in Iowa and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Iowa.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Iowa commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

**Kansas**

339.    By reason of the foregoing, Merck, Glenmark, and Par have violated Kansas Statutes, §§ 50-101, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.      Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Kansas; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Kansas; and (3) TID and members of the Damages Class, including those who resided in Kansas and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Kansas.

b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Kansas commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Kansas Statutes, §§ 50-101, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Kansas Statutes, §§ 50-101, *et seq.*

**Massachusetts**

340.    By reason of the foregoing, Merck, Glenmark, and Par have violated Massachusetts General Laws, Mass. Gen. L. Ch. 93A, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.      Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects:

(1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Massachusetts; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Massachusetts; and (3) TID and members of the Damages Class, including those who resided in Massachusetts and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Massachusetts.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Massachusetts commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Massachusetts General Laws, Mass. Gen. L. Ch. 93A, *et seq*. Accordingly, TID and members of the Damages Class seek all forms of relief available under Massachusetts General Laws, Mass. Gen. L. Ch. 93A, *et seq*.

**Maine**

341.    By reason of the foregoing, Merck, Glenmark, and Par have violated Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq*. TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed,

-92-

and eliminated throughout Maine; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Maine; and (3) TID and members of the Damages Class, including those who resided in Maine and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Maine.

b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Maine commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Maine Revised Statutes, 10 M.R.S.A. §§ 1101, *et seq.*

**Michigan**

342.    By reason of the foregoing, Merck, Glenmark, and Par have violated Michigan Compiled Laws, §§ 445.771, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.      Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Michigan; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Michigan; and (3) TID and members of the Damages Class, including those who resided in Michigan and/or

purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Michigan.

        b.     During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Michigan commerce.

        c.     As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.     By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Michigan Compiled Laws, §§ 445.771, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Michigan Compiled Laws, §§ 445.771, *et seq.*

**Minnesota**

    343.    By reason of the foregoing, Merck, Glenmark, and Par have violated Minnesota Statutes, §§ 325D.49, *et seq.* TID on behalf of the Damages Class alleges as follows:

        a.     Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Minnesota; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Minnesota; and (3) TID and members of the Damages Class, including those who resided in Minnesota and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Minnesota.

b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Minnesota commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Minnesota Statutes, §§ 325D.49, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Minnesota Statutes, §§ 325D.49, *et seq.*

**Mississippi**

344.    By reason of the foregoing, Merck, Glenmark, and Par have violated Mississippi Code, §§ 75-21-1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.      Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Mississippi; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Mississippi; and (3) TID and members of the Damages Class, including those who resided in Mississippi and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Mississippi.

b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Mississippi commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Mississippi Code, §§ 75-21-1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Mississippi Code, §§ 75-21-1, *et seq.*

### Nebraska

345.      By reason of the foregoing, Merck, Glenmark, and Par have violated Nebraska Revised Statutes, §§ 59-801, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.      Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Nebraska; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Nebraska; and (3) TID and members of the Damages Class, including those who resided in Nebraska and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Nebraska.

b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Nebraska commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.     By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Nebraska Revised Statutes, §§ 59-801, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Nebraska Revised Statutes, §§ 59-801, *et seq.*

**<u>Nevada</u>**

        346.     By reason of the foregoing, Merck, Glenmark, and Par have violated Nevada Revised Statutes, §§ 598A.010, *et seq.* TID on behalf of the Damages Class alleges as follows:

        a.     Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Nevada; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Nevada; and (3) TID and members of the Damages Class, including those who resided in Nevada and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Nevada.

        b.     During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Nevada commerce.

        c.     As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.     By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Nevada Revised Statutes,

§§ 598A.010, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Nevada Revised Statutes, §§ 598A.010, *et seq.*

**New Hampshire**

347.    By reason of the foregoing, Merck, Glenmark, and Par have violated New Hampshire Revised Statutes, §§ 356:1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout New Hampshire; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout New Hampshire; and (3) TID and members of the Damages Class, including those who resided in New Hampshire and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in New Hampshire.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected New Hampshire commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of New Hampshire Revised Statutes,

§§ 356:1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under New Hampshire Revised Statutes, §§ 356:1, *et seq.*

**<u>New Mexico</u>**

348.    By reason of the foregoing, Merck, Glenmark, and Par have violated New Mexico Statutes, §§ 57-1-1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout New Mexico; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout New Mexico; and (3) TID and members of the Damages Class, including those who resided in New Mexico and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in New Mexico.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected New Mexico commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of New Mexico Statutes, §§ 57-1-1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under New Mexico Statutes, §§ 57-1-1, *et seq.*

**New York**

349.    By reason of the foregoing, Merck, Glenmark, and Par have violated New York General Business Laws, §§ 340, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's combination, trust, or conspiracy was entered in, carried out, effectuated, and perfected within New York, and Merck's, Glenmark's, and Par's conduct within New York injured TID and members of the Classes throughout the United States. Therefore, this claim for relief under New York law is brought on behalf of the Damages Class.

b.    Beginning at a time currently unknown to TID, but at least as early as May 10, 2010, Merck's, Glenmark's, and Par's engaged in a continuing unlawful combination in restraint of the trade and commerce described above, in violation of New York Business and Professions Code § 16720. Merck, Glenmark, and Par have acted in violation of New York General Business Laws, §§ 340, *et seq.*, to raise, stabilize, and maintain price of Zetia and its AB-rated generic equivalents at supracompetitive levels.

c.    The aforesaid violations of New York General Business Laws, §§ 340, *et seq.*, consisted, without limitation, of a continuing unlawful trust, the substantial terms of which were to raise, maintain, and stabilize the price of Zetia and its AB-rated generic equivalents at supracompetitive levels.

d.    For the purpose of forming and effectuating the unlawful trust, Merck, Glenmark, and Par have done those things which they combined and conspired to do, including but not in any way limited to the acts, practices, and course of conduct set forth above and raising and stabilizing the price of Zetia and its AB-rated generic equivalents.

e.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects: (1) price competition in the sale of cyclosporine has been restrained,

suppressed, and/or eliminated in New York; (2) prices for Zetia and its AB-rated generic equivalents have been raised and stabilized at artificially high, noncompetitive levels in New York; and (3) those who purchased Zetia and its AB-rated generic equivalents indirectly from Merck, Glenmark, and Par have been deprived of the benefit of free and open competition.

f.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and the members of the Damages Class have been injured in their business and property in that they paid more for ezetimibe than they otherwise would have paid in the absence of Merck's, Glenmark's, and Par's unlawful conduct. As a result of Merck's, Glenmark's, and Par's violation of New York General Business Laws, §§ 340, *et seq.*, TID and the Damages Class seek treble damages and their cost of suit, including a reasonable attorney's fee, pursuant to New York General Business Laws, §§ 340 (5).

**North Carolina**

350.    By reason of the foregoing, Merck, Glenmark, and Par have violated North Carolina General Statutes §§ 75-1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout North Carolina; and (3) TID and members of the Damages Class, including those who resided in North Carolina and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in North Carolina.

b.        During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected  North Carolina commerce.

c.        As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.        By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of North Carolina General Statutes §§ 75-1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under North Carolina General Statutes §§ 75-1, *et seq.*

**North Dakota**

351.    By reason of the foregoing, Merck, Glenmark, and Par have violated North Dakota Century Code, §§ 51-08.1-01, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.        Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and  stabilized at artificially high levels throughout North Dakota; and (3) TID and  members of the Damages Class, including those who resided in North Dakota and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were  deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in North Dakota.

b.        During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected  North Dakota commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of North Dakota Century Code, §§ 51-08.1-01, *et seq*. Accordingly, TID and members of the Damages Class seek all forms of relief available under North Dakota Century Code, §§ 51-08.1-01, *et seq*.

**Oregon**

352.    By reason of the foregoing, Merck, Glenmark, and Par have violated Oregon Revised Statutes, §§ 646.705, *et seq*. TID on behalf of the Damages Class alleges as follows:

a.      Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Oregon; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Oregon; and (3) TID and members of the Damages Class, including those who resided in Oregon and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Oregon.

b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Oregon commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Oregon Revised Statutes, §§ 646.705, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Oregon Revised Statutes, §§ 646.705, *et seq.*

**Puerto Rico**

353.    By reason of the foregoing, Merck, Glenmark, and Par have violated Laws of Puerto Rico, 10 L.P.R.A. § 257, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.      Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Puerto Rico; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Puerto Rico; and (3) TID and members of the Damages Class, including those who resided in Puerto Rico and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Puerto Rico.

b.      During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Puerto Rico commerce.

c.      As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.      By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Laws of Puerto Rico, 10 L.P.R.A. §

257, *et seq.*  Accordingly, TID and members of the Damages Class seek all forms of relief available under Laws of Puerto Rico, 10 L.P.R.A. § 257, *et seq.*

**Rhode Island**

354.     By reason of the foregoing, Merck, Glenmark, and Par have violated General Laws of Rhode Island, R.I. Gen. Laws §§ 6-36-4, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.     Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Rhode Island; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Rhode Island; and (3) TID and members of the Damages Class, including those who resided in Rhode Island and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Rhode Island.

b.     During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Rhode Island commerce.

c.     As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.     By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of General Laws of Rhode Island, §§ 6-36-4, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under General Laws of Rhode Island, §§ 6-36-4, *et seq.*

**South Dakota**

355.    By reason of the foregoing, Merck, Glenmark, and Par have violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout South Dakota; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout South Dakota; and (3) TID and members of the Damages Class, including those who resided in South Dakota and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in South Dakota.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected South Dakota commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of South Dakota Codified Laws §§ 37-1-3.1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

**Tennessee**

356.    By reason of the foregoing, Merck, Glenmark, and Par have violated Tennessee Code §§ 47-25-101, *et seq*. TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Tennessee; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Tennessee; and (3) TID and members of the Damages Class, including those who resided in Tennessee and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Tennessee.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Tennessee commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Tennessee Code §§ 47-25-101, *et seq*. Accordingly, TID and members of the Damages Class seek all forms of relief available under Tennessee Code §§ 47-25-101, *et seq.*, TID and the Damages Class seek all forms of relief available thereunder.

**Utah**

357.    By reason of the foregoing, Merck, Glenmark, and Par have violated Utah Code §§ 76-10-3101, *et seq*. TID on behalf of the Damages Class alleges as follows:

a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Utah; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Utah; and (3) TID and members of the Damages Class, including those who resided in (or were citizens of) Utah and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Utah.

b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Utah commerce.

c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Utah Code §§ 76-10-3101, *et seq*. Accordingly, TID and members of the Damages Class seek all forms of relief available under Utah Code §§ 76-10-3101, *et seq*.

**Vermont**

358.    By reason of the foregoing, Merck, Glenmark, and Par have Vermont Statutes 9 V.S. §§ 2453, *et seq*. TID on behalf of the Damages Class alleges as follows:

a.        Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Vermont; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Vermont; and (3) TID and members of the Damages Class, including those who resided in Vermont and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Vermont.

b.        During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Vermont commerce.

c.        As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

d.        By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Vermont Statutes 9 V.S. §§ 2453, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Vermont Statutes 9 V.S. §§ 2453, *et seq.*

**West Virginia**

359.    By reason of the foregoing, Merck, Glenmark, and Par have West Virginia Code, §§ 47-18-1, *et seq.* TID on behalf of the Damages Class alleges as follows:

a.        Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed,

and eliminated throughout West Virginia; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout West Virginia; and (3) TID and members of the Damages Class, including those who resided in West Virginia and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in West Virginia.

        b.    During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected West Virginia commerce.

        c.    As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.    By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of West Virginia Code, §§ 47-18-1, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under West Virginia Code, §§ 47-18-1, *et seq.*

**<u>Wisconsin</u>**

        360.    By reason of the foregoing, Merck, Glenmark, and Par have Wisconsin Statutes §§ 133.01, *et seq.* TID on behalf of the Damages Class alleges as follows:

        a.    Merck's, Glenmark's, and Par's conspiracy to monopolize and restrain trade in the market for Zetia and its AB-rated generic equivalents had the following effects: (1) price competition for Zetia and its AB-rated generic equivalents was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Wisconsin; and

(3) TID and members of the Damages Class, including those who resided in Wisconsin and/or purchased Zetia and its AB-rated generic equivalents that was shipped by Merck, Glenmark, or Par were deprived of free and open competition in, and paid supracompetitive, artificially inflated prices for, Zetia and its AB-rated generic equivalents, including in Wisconsin.

        b.       During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Wisconsin commerce.

        c.       As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured in their business and property and are threatened with further injury.

        d.       By reason of the foregoing, Merck, Glenmark, and Par monopolized, and entered into an agreement in restraint of, trade in violation of Wisconsin Statutes §§ 133.01, *et seq.* Accordingly, TID and members of the Damages Class seek all forms of relief available under Wisconsin Statutes §§ 133.01, *et seq.*

## COUNT FOUR—VIOLATION OF STATE CONSUMER PROTECTION STATUTES[59]
### (On Behalf of TID and the Damages Class)

361.    TID hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

362.    Merck, Glenmark, and Par engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

---

[59] Statutory consumer protection violations are alleged herein for the following jurisdictions: Arizona, Alaska, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Georgia, Hawaii, Illinois, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, West Virginia, Wisconsin and the U.S. Virgin Islands.

**Alaska**

363.     Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Alaska Statute § 45.50.471, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Alaska and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Alaska law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Alaska; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Alaska; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Alaska commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Alaska Stat. § 45.50.471, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Arizona**

364.     Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Arizona Revised Statutes, Ariz. Code §§ 44-1255, *et seq*. Merck, Glenmark, and Par knowingly acted in restraint of trade or

commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Arizona and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Arizona law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Arizona; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Arizona; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Arizona commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ariz. Code §§ 44-1255, *et seq*., and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Arkansas**

365.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-101, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Arkansas and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and

Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Arkansas law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Arkansas; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Arkansas; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Arkansas commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Arkansas Code Annotated, § 4-88-101, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

## California

366.   Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of California Business and Professions Code § 17200, *et seq.* During the Class Period, Merck, Glenmark, and Par have manufactured, marketed, sold, or distributed Zetia and its AB-rated generic equivalents in California, and committed and continue to commit acts of unfair competition, as defined by § 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above. This claim is instituted pursuant to §§ 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Merck, Glenmark, and Par for acts, as alleged herein, that violated § 17200 of the California Business and Professions Code,

commonly known as the Unfair Competition Law. Merck's, Glenmark's, and Par's conduct as alleged herein violated § 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Merck, Glenmark, and Par, as alleged herein, constituted a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code §17200, *et seq.*, including, but not limited to, the following: (1) the violations of Section 1 of the Sherman Act, as set forth above; (2) the violations of § 16720, *et seq.* of the California Business and Professions Code, set forth above. Merck's, Glenmark's, and Par's acts, omissions, misrepresentations, practices, and non-disclosures, as described above, whether or not in violation of § 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; (3) Merck's, Glenmark's, and Par's acts or practices are unfair to purchasers of Zetia and its AB-rated generic equivalents in California within the meaning of § 17200, California Business and Professions Code; and (4) Merck's, Glenmark's, and Par's acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code. TID and members of the Damages Class are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that have been obtained by Merck, Glenmark, and Par as a result of such business acts or practices. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected California commerce and consumers. The illegal conduct alleged herein is continuing and there is no indication that Merck, Glenmark, and Par will not continue such activity into the future. The unlawful and unfair business practices of Merck, Glenmark, and Par, and each of them, as described above, have caused and continue to cause TID and members of the Damages Class to pay

supracompetitive and artificially inflated prices for Zetia and its AB-rated generic equivalents. TID and members of the Damages Class suffered injury in fact and lost money or property as a result of such unfair competition. The conduct of Merck, Glenmark, and Par as alleged in this Complaint violates § 17200 of the California Business and Professions Code. As alleged in this Complaint, Merck, Glenmark, and Par have been unjustly enriched as a result of its wrongful conduct and unfair competition. TID and members of the Damages Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Merck, Glenmark, and Par as a result of such business practices, pursuant to the California Business and Professions Code, §§17203 and 17204.

**Colorado**

367.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Colorado and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Colorado law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Colorado; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Colorado; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its

AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Colorado commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Consumer Protection Act, Colorado Rev. Stat. § 6-1-101, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Delaware**

368.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Delaware and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Delaware law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Delaware; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Delaware; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Delaware commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have

been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Delaware Consumer Fraud Act, 6 Del. Code § 2511, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**District of Columbia**

369.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in the District of Columbia and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of District of Columbia law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected District of Columbia commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or

deceptive acts or practices in violation of District of Columbia Code § 28-3901, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Florida**

370.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Florida and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Florida law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Florida; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Florida; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Florida commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Georgia**

371.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Georgia and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Georgia law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Georgia; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Georgia; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Georgia commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Hawaii**

372.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Hawaii and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Hawaii law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Hawaii; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Hawaii commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Revised Statutes Annotated § 480-1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Illinois**

373.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Illinois Compiled Statutes, 815

ILCS §§ 505/1, *et seq.*  Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Illinois and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Illinois law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Illinois; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Illinois; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Illinois commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Illinois Compiled Statutes, 815 ILCS §§ 505/1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Kansas**

374.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Kansas Statutes, Kan. Stat. §§ 50-623, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Kansas and took efforts to

conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Kansas law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Kansas; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Kansas; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Kansas commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Kansas Statute §§ 50-623, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

## Maine

375.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Maine Revised Statutes, 5 Me. Rev. Stat. §§ 207, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Maine and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Maine law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and

eliminated throughout Maine; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Maine; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Maine commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of 5 Me. Rev. Stat. §§ 207, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**<u>Massachusetts</u>**

376.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.* Merck, Glenmark, and Par have been engaged in trade or commerce as defined by G.L. 93A. Merck, Glenmark, and Par, in a market that includes Massachusetts, knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Massachusetts and took efforts to conceal their conduct from TID and members of the Damages Class. Merck, Glenmark, and Par engaged in an unfair and deceptive trade practices during the course of their business dealings, which significantly affected TID and the Class as actual or potential consumers of Merck's, Glenmark's, and Par's goods and which caused TID and the Class to suffer injury. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated

throughout Massachusetts; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Massachusetts; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Massachusetts commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Massachusetts Gen. Laws, Ch. 93A, § 1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Michigan**

377.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Michigan and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Michigan law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Michigan; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Michigan; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and

members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Michigan commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Michigan Consumer Protection Statute, Mich. Compiled Laws § 445.903, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Minnesota**

378.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Minnesota and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Minnesota law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Minnesota; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Minnesota; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Minnesota

commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Missouri**

379.     Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.* TID and members of the Damages Class purchased Zetia and its AB-rated generic equivalents for personal or family purposes. Merck, Glenmark, and Par engaged in the conduct described herein in connection with the sale of Zetia and its AB-rated generic equivalents in trade or commerce in a market that includes Missouri. Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Missouri, which conduct constituted unfair practices in that it was unlawful under federal and state law, violated public policy, was unethical, oppressive and unscrupulous, and caused substantial injury to TID and members of the Damages Class. Merck, Glenmark, and Par concealed, suppressed, and omitted to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. The concealed, suppressed, and omitted facts would have been important to TID and members of the Damages Class as they related to the cost of the ezetimibe they purchased—and the ezetimibe they would have purchased at lower cost but for the conspiracy alleged. Merck,

Glenmark, and Par misrepresented the terms of the settlement and understanding between them

of how they planned to exclude competition, by making public statements that deliberately

omitted reference to any payment from Merck, any plan by Glenmark and Par to refrain from

launching generic Zetia, and any plan by Merck to forgo launching an AG. Merck's, Glenmark's,

and Par's statements and conduct concerning the price of Zetia, and later, its generic equivalent,

were deceptive as they had the tendency or capacity to mislead TID and members of the

Damages Class to believe that they were purchasing Zetia and its generic equivalent at prices

established by free and fair market. Merck's, Glenmark's, and Par's unlawful conduct had the

following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated

throughout Missouri; (2) Zetia and generic ezetimibe prices were raised, maintained, and

stabilized at artificially high levels throughout Missouri; (3) TID and members of the Damages

Class were deprived of free and open competition; and (4) TID and members of the Damages

Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic

equivalents. The foregoing acts and practices substantially affected Missouri commerce and

consumers and constituted unlawful practices in violation of the Missouri Merchandising

Practices Act. As a direct and proximate result of the above-described unlawful practices, TID

and members of the Damages Class suffered ascertainable loss of money or property.

Accordingly, TID and members of the Damages Class seek all relief available under Missouri's

Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "[t]he act,

use or employment by any person of any deception, fraud, false pretense, false promise,

misrepresentation, unfair practice or the concealment, suppression, or omission of any material

fact in connection with the sale or advertisement of any merchandise in trade or commerce…",

as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, *et seq.*, 15 CSR 60-8.010, *et seq.*, and 15 CSR 60-9.010, *et seq.*, and Mo. Rev. Stat. § 407.025.

**<u>Montana</u>**

380.     Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Montana and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Montana law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Montana; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Montana; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Montana Unfair Trade Practices and Consumer Protection Act of 1970, Mont. Code, § 30-14-103, *et seq.*, and § 30-14-201, *et seq.*,

and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Nebraska**

381.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Nebraska and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Nebraska law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Nebraska; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Nebraska commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Nevada**

382.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 598.0903, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its generic equivalent were sold, distributed, or obtained in Nevada. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its generic equivalent. Merck's, Glenmark's, and Par's statements and conduct concerning the price of Zetia and its generic equivalent were deceptive as they had the tendency or capacity to mislead TID and members of the Damages Class to believe that they were purchasing Zetia and its generic equivalent at prices established by a free and fair market. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Nevada; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Nevada; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct had a substantial effect on Nevada commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's violations of law, the TID and members of the Damages Class suffered an ascertainable loss of money or property as a result of Merck's, Glenmark's, and Par's use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Merck's, Glenmark's, and Par's willful and deceptive conduct, as described herein. Merck's,

Glenmark's, and Par's deception, including its affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its generic equivalent at prices set by a free and fair market. Merck's, Glenmark's, and Par's misleading conduct and unconscionable activities constitute violations of Nev. Rev. Stat. § 598.0903, *et seq.*, and, accordingly TID and members of the Damages Class seek all relief available under that statute.

**New Hampshire**

383.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in New Hampshire and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of New Hampshire law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout New Hampshire; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout New Hampshire; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected New Hampshire commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's

unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**New Jersey**

384.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Jersey Consumer Fraud Act, N.J. Statutes § 56:8-1, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its generic equivalent were sold, distributed, or obtained in New Jersey. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its generic equivalent. Merck's, Glenmark's, and Par's statements and conduct concerning the price of Zetia and its generic equivalent were deceptive as they had the tendency or capacity to mislead TID and members of the Damages Class to believe that they were purchasing Zetia and its generic equivalent at prices established by a free and fair market. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout New Jersey; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout New Jersey; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct had a substantial effect on New Jersey

-133-

commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's violations of law, the TID and members of the Damages Class suffered an ascertainable loss of money or property as a result of Merck's, Glenmark's, and Par's use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Merck's, Glenmark's, and Par's willful and deceptive conduct, as described herein. Merck's, Glenmark's, and Par's deception, including its affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its generic equivalent at prices set by a free and fair market. Merck's, Glenmark's, and Par's misleading conduct and unconscionable activities constitute violations of N.J. Statutes § 56:8-1, *et seq.*, and, accordingly TID and members of the Damages Class seek all relief available under that statute.

**New Mexico**

385.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the New Mexico Stat. § 57-12-1, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce by affecting, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which Zetia and its generic equivalent were sold, distributed or obtained in New Mexico and took efforts to conceal their conduct from the TID and members of the Damages Class. The aforementioned conduct on the part of Merck, Glenmark, and Par constituted "unconscionable trade practices," in violation of New Mexico Stat. § 57-12-3, in that such conduct, *inter alia*, resulted in a gross disparity between the value received by TID and members of the Damages Class and the prices paid by them for Zetia and its AB-rated generic equivalents as set forth in New Mexico Stat. § 57-12-2E. TID and members of the Damages Class were not aware that Merck, Glenmark, and Par had illegally extended their monopoly in the market for Zetia and its AB-rated generic

equivalents, and were therefore unaware that they were being unfairly and illegally overcharged.

Merck had the sole power to set that price until December 2016, after which it shared that power

with Glenmark and Par, and TID and members of the Damages Class had no power to negotiate

a lower price. Moreover, TID and members of the Damages Class lacked any meaningful choice

in purchasing Zetia and its generic equivalent because they were unaware of the unlawful

overcharge due to the conspiracy between Merck, Glenmark, and Par, and there was no

reasonable alternative source of supply through which TID and members of the Damages Class

could avoid the overcharges. Merck's, Glenmark's, and Par's conduct with regard to sales of

Zetia and its generic equivalent, including their illegal, secret conspiracy that would fix the price

of Zetia and its generic equivalent at supracompetitive levels and overcharge consumers, was

substantively unconscionable because it was one-sided and unfairly benefited Defendants at the

expense of TID and the public. Merck, Glenmark, and Par took grossly unfair advantage of TID

and members of the Damages Class. The suppression of competition that has resulted from

Merck's, Glenmark's, and Par's conspiracy has ultimately resulted in unconscionably higher

prices for consumers so that there was a gross disparity between the price paid and the value

received for Zetia and its generic equivalent. Merck's, Glenmark's, and Par's unlawful conduct

had the following effects: (1) ezetimibe price competition was restrained, suppressed, and

eliminated throughout New Mexico; (2) Zetia and generic ezetimibe prices were raised,

maintained, and stabilized at artificially high levels throughout New Mexico; (3) TID and

members of the Damages Class were deprived of free and open competition; and (4) TID and

members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its

AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal

conduct had a substantial effect on New Mexico commerce and consumers. As a direct and

proximate result of Merck's, Glenmark's, and Par's violations of law through their use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

### New York

386.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of N.Y. Gen. Bus. Law § 349, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce by affecting, controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed or obtained in New York and took efforts to conceal its conduct from TID and members of the Damages Class. Merck, Glenmark, and Par made public statements regarding the nature of the Merck-Glenmark settlement that were not in accord with the facts. Merck's, Glenmark's, and Par's statements were materially misleading; and Merck, Glenmark, and Par alone possessed material information that was relevant to consumers, but failed to provide the information. Because of Merck's, Glenmark's, and Par's unlawful trade practices in New York, New York Damages Class members who indirectly purchased Zetia and its AB-rated generic equivalents were misled to believe that they were paying a fair price for Zetia and its AB-rated generic equivalents or the price increases for Zetia and its AB-rated generic equivalents were for valid business reasons; and similarly situated consumers were affected by Merck's, Glenmark's, and Par's conduct. Merck, Glenmark, and Par knew that their unlawful trade practices with respect to Zetia and its AB-rated generic equivalents would have an broad impact on New York consumers, and not just Merck's, Glenmark's, and Par's direct

customers, causing Damages Class members who indirectly purchased Zetia and its AB-rated generic equivalents to be injured by paying more for their ezetimibe requirements than they would have paid in the absence of Merck's, Glenmark's, and Par's unlawful trade acts and practices. Merck's, Glenmark's, and Par's conduct described herein constitutes consumer-oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of consumers in New York State in an honest marketplace in which economic activity is conducted in a competitive manner. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout New York; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout New York; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck, Glenmark, and Par marketed, sold, or distributed Zetia and its AB-rated generic equivalents in New York, and Merck's, Glenmark's, and Par's illegal conduct substantially affected New York commerce and consumers. During the Class Period, Merck, Glenmark, and Par directly, or indirectly and through affiliates it dominated and controlled, manufactured, sold and/or distributed Zetia and its AB-rated generic equivalents in New York. TID and members of the Damages Class seek all relief available pursuant to N.Y. Gen. Bus. Law § 349(h).

**North Carolina**

387.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce by affecting,

controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed or obtained in North Carolina and took efforts to conceal its conduct from TID and members of the Damages Class. Merck, Glenmark, and Par made public statements regarding the nature of the Merck-Glenmark settlement that were not in accord with the facts. Merck's, Glenmark's, and Par's statements were materially misleading; and Merck, Glenmark, and Par alone possessed material information that was relevant to consumers, but failed to provide the information. Merck's, Glenmark's, and Par's described herein constitutes consumer-oriented deceptive acts or practices within the meaning of North Carolina law, which resulted in consumer injury and broad adverse impact on the public at large, and harmed the public interest of North Carolina consumers in an honest marketplace in which economic activity is conducted in a competitive manner. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout North Carolina; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout North Carolina; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck, Glenmark, and Par marketed, sold, or distributed Zetia and its AB-rated generic equivalents in North Carolina, and Merck's, Glenmark's, and Par's illegal conduct substantially affected North Carolina commerce and consumers. During the Class Period, Merck, Glenmark, and Par directly, or indirectly and through affiliates it dominated and controlled, manufactured, sold, or distributed Zetia and its AB-rated generic equivalents in North Carolina. TID and members of the Damages Class seek actual damages for their injuries caused by these violations in an amount

to be determined at trial and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of North Carolina Gen. Stat. § 75-1.1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

### North Dakota

388.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce in North Dakota, by affecting, controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in North Dakota. Merck, Glenmark, and Par made public statements regarding the nature of the Merck-Glenmark settlement that were not in accord with the facts. Merck's, Glenmark's, and Par's statements were materially misleading; and Merck, Glenmark, and Par alone possessed material information that was relevant to consumers, but failed to provide the information. Merck, Glenmark, and Par misrepresented to all purchasers during the Class Period that prices of Zetia and its AB-rated generic equivalents were competitive and fair. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout North Dakota; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout North Dakota; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct had a substantial effect on North Dakota commerce and consumers. As a direct and proximate result

of Merck's, Glenmark's, and Par's use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. Merck's, Glenmark's, and Par's deception, including their affirmative misrepresentations and omissions regarding the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's misleading conduct and unconscionable activities constitute violations of N.D. Century Code § 51-15-01, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Oregon**

389.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Oregon Revised Statutes, Or. Rev. Stat. §§ 646.605, *et seq*. Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Oregon and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Oregon law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Oregon; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Oregon; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct

substantially affected Oregon commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Or. Rev. Stat. §§ 646.605, *et seq*., and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Pennsylvania**

390.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Pennsylvania Statutes, 73 Pa. Stat. Ann. §§ 201-1, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Pennsylvania and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Pennsylvania law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Pennsylvania; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Pennsylvania; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Pennsylvania commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have

engaged in unfair competition or unfair or deceptive acts or practices in violation of 73 Pa. Stat. Ann. §§ 201-1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Rhode Island**

391.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Rhode Island. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's statements and conduct concerning the price of Zetia and its AB-rated generic equivalents were deceptive as they had the tendency or capacity to mislead TID and members of the Damages Class to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices established by a free and fair market. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Rhode Island; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Rhode Island; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct had a substantial effect on Rhode Island commerce and consumers. As a direct and proximate result

of Merck's, Glenmark's, and Par's violations of law, TID and members of the Damages Class

suffered an ascertainable loss of money or property as a result of Merck's, Glenmark's, and Par's

use or employment of unconscionable and deceptive commercial practices as set forth above.

That loss was caused by Merck's, Glenmark's, and Par's willful and deceptive conduct, as

described herein. Merck's, Glenmark's, and Par's deception, including its affirmative

misrepresentations and omissions concerning the validity of its patents, likely misled all

purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia

and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's,

and Par's misleading conduct and unconscionable activities constitute violations of R.I. Gen.

Laws § 6-13.1-1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all

relief available under that statute.

**South Carolina**

392.    Merck, Glenmark, and Par have engaged in unfair competition or unfair,

unconscionable, or deceptive acts or practices in violation of the South Carolina Unfair Trade

Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* Merck, Glenmark, and Par knowingly acted in

restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels,

the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained

in South Carolina. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID

and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful

activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's,

Glenmark's, and Par's statements and conduct concerning the price of Zetia and its AB-rated

generic equivalents were deceptive as they had the tendency or capacity to mislead TID and

members of the Damages Class to believe that they were purchasing Zetia and its AB-rated

generic equivalents at prices established by a free and fair market. Merck's, Glenmark's, and

Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout South Carolina; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout South Carolina; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct had a substantial effect on South Carolina commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's violations of law, TID and members of the Damages Class suffered an ascertainable loss of money or property as a result of Merck's, Glenmark's, and Par's use or employment of unconscionable and deceptive commercial practices as set forth above. That loss was caused by Merck's, Glenmark's, and Par's willful and deceptive conduct, as described herein. Merck's, Glenmark's, and Par's deception, including its affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's misleading conduct and unconscionable activities constitute violations of S.C. Code Ann. § 39-5-10, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**South Dakota**

393.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce in South Dakota, by affecting, controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and

its AB-rated generic equivalents were sold, distributed, or obtained in South Dakota. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck, Glenmark, and Par misrepresented to all purchasers during the Class Period that prices of Zetia and its AB-rated generic equivalents were competitive and fair. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout South Dakota; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's illegal conduct substantially affected South Dakota commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's willful use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. Merck's, Glenmark's, and Par's deception, including their affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's affirmative misrepresentations and omissions constitute information important to TID and members of the Damages Class as they related to the cost of the ezetimibe they purchased. Merck, Glenmark, and Par have engaged in unfair competition or

unfair or deceptive acts or practices in violation of S.D. Codified Laws § 37-24-1, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Tennessee**

394.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of Tennessee Code Annotated, Tenn. Code §§ 47-18-101, *et seq*. Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Tennessee and took efforts to conceal its conduct from TID and members of the Damages Class. Merck's, Glenmark's, and Par's aforementioned conduct constituted "unconscionable" and "deceptive" acts or practices in violation of Tennessee law. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) Zetia and generic ezetimibe prices were raised, maintained, and stabilized at artificially high levels throughout Tennessee; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct substantially affected Tennessee commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's unlawful conduct, TID and members of the Damages Class have been injured and are threatened with further injury. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Tenn. Code §§ 47-18-101, *et seq*., and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Utah**

  395. Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Utah Consumer Sales Practices Act, Ut. Stat. § 13-11-1, *et seq.* TID and members of the Damages Class purchased Zetia and its AB-rated generic equivalents for personal, family, or household purposes. Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market that includes Utah, by affecting, controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Utah. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck, Glenmark, and Par owed a duty to disclose such facts, and considering the relative lack of sophistication of the average, non-business purchaser, Merck, Glenmark, and Par breached that duty by their silence. Merck, Glenmark, and Par misrepresented to all purchasers during the Class Period that prices of Zetia and its AB-rated generic equivalents were competitive and fair. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Utah; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Utah; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's illegal conduct substantially affected Utah commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's violations of law, TID and members of the Damages Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of

unconscionable and deceptive commercial practices as set forth above and are threatened with further injury. That loss was caused by Merck's, Glenmark's, and Par's willful and deceptive conduct, as described herein. Merck's, Glenmark's, and Par's deception, including their affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's affirmative misrepresentations and omissions constitute information important to TID and members of the Damages Class as they related to the cost of the ezetimibe they purchased. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Ut. Stat. § 13-11-1 *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute and as equity demands.

## Vermont

396.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of 9 Vermont Statutes § 2451, *et seq.* Merck, Glenmark, and Par knowingly acted in restraint of trade or commerce by maintaining, at non-competitive and artificially inflated levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Vermont. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's statements and conduct concerning the price of Zetia and its AB-rated generic equivalents were deceptive as they had the tendency or capacity to mislead TID and members of the Damages Class to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices established by a

free and fair market. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Vermont; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Vermont; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. During the Class Period, Merck's, Glenmark's, and Par's illegal conduct had a substantial effect on Vermont commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. That loss was caused by Merck's, Glenmark's, and Par's willful and deceptive conduct, as described herein. Merck's, Glenmark's, and Par's deception, including its affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's misleading conduct and unconscionable activities constitute unfair competition or unfair or deceptive acts or practices in violation of 9 Vt. Stat. § 2451, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**Virginia**

397.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Virginia Consumer Protection Act of 1977, Va. Code § 59.1-196, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce in Virginia, by affecting, controlling, or maintaining, at artificial and non-competitive

levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Virginia. Merck, Glenmark, and Par deliberately failed to disclose material facts to the TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck, Glenmark, and Par misrepresented to all purchasers during the Class Period that prices of Zetia and its AB-rated generic equivalents were competitive and fair. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Virginia; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Virginia; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's illegal conduct substantially affected Virginia commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's willful use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. Merck's, Glenmark's, and Par's deception, including their affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's affirmative misrepresentations and omissions constitute information important to TID and members of the Damages Class as they related to the cost of the ezetimibe they purchased. Merck, Glenmark, and Par have engaged in unfair competition or

unfair or deceptive acts or practices in violation of Va. Code § 59.1-196, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**<u>West Virginia</u>**

398.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce in West Virginia, by affecting, controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in West Virginia. Merck, Glenmark, and Par deliberately failed to disclose material facts to the TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck, Glenmark, and Par misrepresented to all purchasers during the Class Period that prices of Zetia and its AB-rated generic equivalents were competitive and fair. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout West Virginia; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's illegal conduct substantially affected West Virginia commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's willful use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. Merck's, Glenmark's, and Par's deception, including their affirmative

misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's affirmative misrepresentations and omissions constitute information important to TID and members of the Damages Class as they related to the cost of the ezetimibe they purchased. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of W.Va. Code § 46A-6-101, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**<u>Wisconsin</u>**

399.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce in Wisconsin, by affecting, controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in Wisconsin. Merck, Glenmark, and Par deliberately failed to disclose material facts to TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck, Glenmark, and Par misrepresented to all purchasers during the Class Period that prices of Zetia and its AB-rated generic equivalents were competitive and fair. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid

supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's illegal conduct substantially affected Wisconsin commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's willful use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. Merck's, Glenmark's, and Par's deception, including their affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's affirmative misrepresentations and omissions constitute information important to TID and members of the Damages Class as they related to the cost of the ezetimibe they purchased. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of Wisc. Stat. § 100.18, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute.

**U.S. Virgin Islands**

400.    Merck, Glenmark, and Par have engaged in unfair competition or unfair, unconscionable, or deceptive acts or practices in violation of the U.S. Virgin Islands Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. §§ 102, 301-35, *et seq.* Merck, Glenmark, and Par acted in restraint of trade or commerce in the U.S. Virgin Islands (U.S.V.I.), by affecting, controlling, or maintaining, at artificial and non-competitive levels, the prices at which Zetia and its AB-rated generic equivalents were sold, distributed, or obtained in the U.S.V.I. Merck, Glenmark, and Par deliberately failed to disclose material facts to the TID and members of the Damages Class concerning Merck's, Glenmark's, and Par's unlawful activities and artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck, Glenmark,

and Par misrepresented to all purchasers during the Class Period that prices of Zetia and its AB-rated generic equivalents were competitive and fair. Merck's, Glenmark's, and Par's unlawful conduct had the following effects: (1) ezetimibe price competition was restrained, suppressed, and eliminated throughout the U.S.V.I.; (2) prices for Zetia and its AB-rated generic equivalents were raised, maintained, and stabilized at artificially high levels throughout the U.S.V.I.; (3) TID and members of the Damages Class were deprived of free and open competition; and (4) TID and members of the Damages Class paid supracompetitive, artificially inflated prices for Zetia and its AB-rated generic equivalents. Merck's, Glenmark's, and Par's illegal conduct substantially affected U.S.V.I. commerce and consumers. As a direct and proximate result of Merck's, Glenmark's, and Par's willful use or employment of unconscionable and deceptive commercial practices as set forth above, TID and members of the Damages Class suffered an ascertainable loss of money or property. Merck's, Glenmark's, and Par's deception, including their affirmative misrepresentations and omissions concerning the nature of the Merck-Glenmark settlement, likely misled all purchasers acting reasonably under the circumstances to believe that they were purchasing Zetia and its AB-rated generic equivalents at prices set by a free and fair market. Merck's, Glenmark's, and Par's affirmative misrepresentations and omissions constitute information important to TID and members of the Damages Class as they related to the cost of the ezetimibe they purchased. Merck, Glenmark, and Par have engaged in unfair competition or unfair or deceptive acts or practices in violation of 12A V.I.C. §§ 102, 301-35, *et seq.*, and, accordingly, TID and members of the Damages Class seek all relief available under that statute and as equity demands.

## COUNT FIVE—UNJUST ENRICHMENT[60]
### (On Behalf of TID and the Damages Class)

401.    TID hereby repeats and incorporates by reference each preceding and succeeding paragraphs as though fully set forth herein.

402.    To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

403.    Merck, Glenmark, and Par have unlawfully benefited from their sales of Zetia and its AB-rated generic equivalents because of the unlawful and inequitable acts alleged in this Complaint. Merck, Glenmark, and Par unlawfully overcharged TID, who made purchases of or reimbursements for Zetia and its AB-rated generic equivalents at prices that were more than they would have been but for Merck's, Glenmark's, and Par's unlawful actions.

404.    Merck's, Glenmark's, and Par's financial benefits resulting from its unlawful and inequitable acts are traceable to overpayments by TID and the Damages Class.

405.    TID and the Damages Class have conferred upon Merck, Glenmark, and Par an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of TID and the Damages Class.

406.    Merck, Glenmark, and Par have been enriched by revenue resulting from unlawful overcharges for Zetia and its AB-rated generic equivalents while TID and the Damages Class have been impoverished by the overcharges they paid for Zetia and its AB-rated generic equivalents imposed through Merck's, Glenmark's, and Par's unlawful conduct. Merck's, Glenmark's, and Par's enrichment and TID's and the Damages Class's impoverishment are connected.

---

[60] Unjust enrichment claims are alleged herein under the laws of all States (except Ohio and Indiana) as well as the District of Columbia, Puerto Rico and the U.S. Virgin Islands.

407.    There is no justification for Merck's, Glenmark's, and Par's retention of, and enrichment from, the benefits they received that caused impoverishment to TID and the Damages Class, because TID and the Damages Class paid supracompetitive prices that inured to Merck's, Glenmark's, and Par's benefit, and it would be inequitable for Merck, Glenmark, and Par to retain any revenue gained from their unlawful overcharges.

408.    TID and the Damages Class did not interfere with Merck's, Glenmark's, and Par's affairs in any manner that conferred these benefits upon Merck, Glenmark, or Par.

409.    The benefits conferred upon Merck, Glenmark, and Par were not gratuitous, in that they constituted revenue created by unlawful overcharges arising from Merck's, Glenmark's, and Par's illegal and unfair actions to inflate the prices of Zetia and its AB-rated generic equivalents.

410.    The benefits conferred upon Merck, Glenmark, and Par are measurable, in that the revenue Merck, Glenmark, and Par have earned due to their unlawful overcharges for Zetia and its AB-rated generic equivalents is ascertainable by review of sales records.

411.    It would be futile for TID and the Damages Class to seek a remedy from any party with whom they have privity of contract. Merck, Glenmark, and Par have paid no consideration to any other person for any of the unlawful benefits it received indirectly from TID and the Damages Class with respect to Merck's, Glenmark's, and Par's sales of Zetia and its AB-rated generic equivalents.

412.    It would be futile for TID and the Damages Class to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Zetia and its AB-rated generic equivalents, as the intermediaries are not liable and

cannot reasonably be expected to compensate TID and the Damages Class for Merck's, Glenmark's, and Par's unlawful conduct.

413.    The economic benefit of overcharges and monopoly profits derived by Merck, Glenmark, and Par through charging supracompetitive and artificially inflated prices for Zetia and its AB-rated generic equivalents is a direct and proximate result of Merck's, Glenmark's, and Par's unlawful practices.

414.    The financial benefits derived by Merck, Glenmark, and Par rightfully belong to TID and the Damages Class, because TID and the Damages Class paid supracompetitive prices during the Class Period, inuring to the benefit of Merck, Glenmark, and Par.

415.    It would be inequitable under unjust enrichment principles under the laws of all States (except Ohio and Indiana) and of the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, for Merck, Glenmark, and Par to be permitted to retain any of the overcharges for Zetia and its AB-rated generic equivalents derived from Merck's, Glenmark's, and Par's unlawful, unfair, and unconscionable methods, acts, and trade practices alleged in this Complaint.

416.    Merck, Glenmark, and Par are aware of and appreciate the benefits bestowed upon them by TID and the Damages Class. Merck, Glenmark, and Par consciously accepted the benefits and continue to do so as of the date of this filing.

417.    Merck, Glenmark, and Par should be compelled to disgorge in a common fund for the benefit of TID and the Damages Class all unlawful or inequitable proceeds they received from their sales of Zetia and its AB-rated generic equivalents.

418.    A constructive trust should be imposed upon all unlawful or inequitable sums received by Merck, Glenmark, and Par traceable to indirect purchases of Zetia and its AB-rated generic equivalents by TID and the Damages Class.

419.    TID and the Damages Class have no adequate remedy at law.

420.    By engaging in the foregoing unlawful or inequitable conduct depriving TID and the Damages Class of the opportunity to purchase lower-priced Zetia and its AB-rated generic equivalents and forcing them to pay higher prices for both, Merck, Glenmark, and Par have been unjustly enriched in violation of the common law of the following jurisdictions: District of Columbia, Puerto Rico, the U.S. Virgin Islands, and the following states:

    a.     State of Alabama;

    b.     State of Alaska;

    c.     State of Arizona;

    d.     State of Arkansas;

    e.     State of California;

    f.     State of Colorado;

    g.     State of Connecticut;

    h.     State of Delaware;

    i.     District of Columbia;

    j.     State of Florida;

    k.     State of Georgia;

    l.     State of Hawaii;

    m.     State of Idaho;

    n.     State of Illinois;

o.      State of Iowa;

p.      State of Kansas;

q.      Commonwealth of Kentucky;

r.      State of Louisiana;

s.      State of Maine;

t.      State of Maryland;

u.      Commonwealth of Massachusetts;

v.      State of Michigan;

w.      State of Minnesota;

x.      State of Mississippi;

y.      State of Missouri;

z.      State of Montana;

aa.     State of Nebraska;

bb.     State of Nevada;

cc.     State of New Hampshire;

dd.     State of New Jersey;

ee.     State of New Mexico;

ff.     State of New York;

gg.     State of North Carolina;

hh.     State of North Dakota;

ii.     State of Oklahoma;

jj.     State of Oregon;

kk.     Commonwealth of Pennsylvania;

ll.     Puerto Rico;

mm.     State of Rhode Island;

nn.     State of South Carolina;

oo.     State of South Dakota;

pp.     State of Tennessee;

qq.     State of Texas;

rr.     U.S. Virgin Islands;

ss.     State of Utah;

tt.     State of Vermont;

uu.     Commonwealth of Virginia;

vv.     State of Washington;

ww.     State of West Virginia;

xx.     State of Wisconsin; and

yy.     State of Wyoming.

## XIV.   <u>PRAYER FOR RELIEF</u>

421.     WHEREFORE, TID, on behalf of itself and the Classes, prays that the Court:

a.     Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Classes, and declare TID as the representative of the Classes;

b.     Enter joint and several judgments against Defendants and in favor of TID and the Classes;

c.     Award the Damages Class damages (*i.e.*, three times overcharges) in an amount to be determined at trial;

d.    Award TID and the Classes their costs of suit, including reasonable attorneys' fees as provided by law; and

e.    Award such further and additional relief as is necessary to correct for the anticompetitive market effects caused by Defendants' unlawful conduct, as the Court may deem just and proper under the circumstances.

## XV.    **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, TID, on behalf of itself and the proposed Classes, demands a trial by jury on all issues so triable.

Dated: June 29, 2018

s/ *Ashley M. Bond*
Ashley M. Bond (VA Bar # 78301)
DUNCAN & ALLEN
1730 Rhode Island Ave, NW, Ste. 700
Washington, DC 20036
Telephone: (202) 289-8400
Facsimile: (202) 289-8450
amb@duncanallen.com

*Counsel for Turlock Irrigation District*